## PUYALLUP TRIBE *v.* DEPARTMENT OF GAME OF WASHINGTON ET AL.

No. 247.   Argued March 25–26, 1968.—Decided May 27, 1968.*

*Arthur Knodel* argued the cause and filed briefs for petitioner in No. 247.   *Jack E. Tanner* argued the cause and filed a brief for petitioners in No. 319.

*Joseph L. Coniff,* Special Assistant Attorney General of Washington, and *Mike R. Johnston,* Assistant Attor-

---

*Together with No. 319, *Kautz et al.* v. *Department of Game of Washington et al.*, also on certiorari to the same court.

ney General, argued the cause for respondents in both cases. With them on the briefs was *John J. O'Connell,* Attorney General.

*John S. Martin, Jr.,* argued the cause for the United States, as *amicus curiae,* urging reversal in both cases. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Martz, Louis F. Claiborne, Roger P. Marquis,* and *Edmund B. Clark.*

*George S. Woodworth,* Assistant Attorney General, argued the cause for the State of Oregon, as *amicus curiae,* urging affirmance in both cases. With him on the brief were *Robert Y. Thornton,* Attorney General, and *Roy C. Atchison* and *Henry S. Kane,* Assistant Attorneys General. *T. J. Jones III* argued the cause for the State of Idaho Fish and Game Department, as *amicus curiae,* urging affirmance in both cases. With him on the brief was *Allan G. Shepard,* Attorney General of Idaho.

Briefs of *amici curiae,* urging reversal in No. 247, were filed by *Arthur Lazarus, Jr.,* for the Association on American Indian Affairs, Inc., by *Albert J. Ahern* for the National Congress of American Indians, and by *James B. Hovis* for the Confederated Bands and Tribes of the Yakima Indian Nation.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These cases present a question of public importance which involves in the first place a construction of the Treaty of Medicine Creek made with the Puyallup and Nisqually Indians in 1854 (10 Stat. 1132) and secondly the constitutionality of certain conservation measures adopted by the State of Washington allegedly impinging on those treaty rights.

These suits were brought by respondents in the state court against the Indians for declaratory relief and for an injunction. The trial court held for respondents and with exceptions not relevant to our problem the Supreme Court affirmed in part and remanded for further findings on the conservation aspect of the problem. *Department of Game* v. *Puyallup Tribe,* 70 Wash. 2d 245, 422 P. 2d 754; *Department of Game* v. *Kautz,* 70 Wash. 2d 275, 422 P. 2d 771. We granted the petitions for certiorari and consolidated the cases for oral argument. 389 U. S. 1013.

While the Treaty of Medicine Creek created a reservation for these Indians, no question as to the extent of those reservation rights, if any, is involved here.[1] Our

---

[1] It should be noted that while a reservation was created by Article II of the Treaty, Article VI provided that the President might remove the Indians from the reservation "on remunerating them for their improvements and the expenses of their removal, or may consolidate them with other friendly tribes or bands." Article VI also gave the President authority alternatively to divide the reservation into lots and assign them to those individuals or families who were willing to make these places their permanent home. In 1887 Congress passed the General Allotment Act (24 Stat. 388) authorizing the division of the reservation land among the individual Indians. In 1893 Congress passed the Puyallup Allotment Act, 27 Stat. 633, which established a commission to make the allotments. And by the Act of April 28, 1904, 33 Stat. 565, Congress gave "the consent of the United States" to the removal of prior restrictions on alienation by these Indians. The trial court in No. 247 found that all lands within the boundaries of the reservation created by the Treaty have been transferred to private ownership pursuant to these Acts of Congress, with the exception of two small tracts used as a cemetery for members of the tribe; and much of it is now in the City of Tacoma. See *State* v. *Satiacum,* 50 Wash. 2d 513, 314 P. 2d 400 (1957). Whether in light of this history the reservation has been extinguished is a question we do not reach. Cf. *Seymour* v. *Superintendent,* 368 U. S. 351, 356–359. The Washington Supreme Court seems to hold that the right to fish in streams once within the old reservation is protected by the Article III guarantee. See 70 Wash. 2d, at 261, 262, 422 P. 2d, at 763, 764. There are

question concerns the fishing rights protected by Article III, which so far as relevant reads as follows:

> "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands . . . ."

The fish to which the Treaty rights pertain in these cases are salmon and steelhead, anadromous fish that hatch in the fresh water of the Puyallup River and the Nisqually River. The steelhead is a trout; the salmon are of four species—chinook, silver, chum, and pink. They come in from the ocean, pass through the salt water of Puget Sound, enter the fresh waters at the mouths of rivers, and go up these rivers to spawn. The adult salmon die after spawning, but not necessarily the steelhead. In time the fry return to the ocean and start the cycle anew.

People fish for these species far offshore.[2] As respects fishing within its territorial waters, Washington specifies the time when fishing may take place, the areas open to fishing, and the gear that may be used.[3]

---

indeed no other fishing rights specifically reserved in the Treaty of Medicine Creek except those covered by Article III.

[2] Fishing for salmon in the high seas is governed by a convention agreed to by Canada, Japan, and the United States on May 9, 1952. 4 U. S. T., Pt. I, p. 380, T. I. A. S. No. 2786. As to sockeye salmon and pink salmon, the United States and Canada have a separate convention first signed May 26, 1930, and amended as of July 3, 1957. 8 U. S. T., Pt. I, p. 1057, T. I. A. S. No. 3867.

Washington bars the use of nets in fishing for salmon in the international waters of the Pacific. Wash. Rev. Code § 75.12.220.

[3] Wash. Admin. Code §§ 220–16–010 to 220–48–060 (salmon); Wash. Dept. of Game, Perm. Regs. Nos. 32–35 (1964), Temp. Reg. No. 273 (1968) (steelhead).

Fishing licenses are prescribed.[4] Steelhead may be taken only by hook[5] and not commercially. Salmon may be taken commercially with nets of a certain type in certain areas.[6] Set nets or fixed appliances are barred in "any waters" of the State for the taking of salmon or steelhead.[7] So is "monofilament gill net webbing."[8]

Nearly every river in the State has a salmon preserve at its mouth;[9] and Commencement Bay at the mouth of the Puyallup River is one of those preserves.[10]

The Puyallup Indians use set nets to fish in Commencement Bay and at the mouth of the Puyallup River and in areas upstream. The Nisqually Indians use set nets in the fresh waters of the Nisqually River. These Indians fish not only for their own needs but commercially as well, supplying the markets with a large volume of salmon. The nets used are concededly illegal if the laws and regulations of the State of Washington are valid; and it is to that question that we now turn.[11]

---

[4] Wash. Rev. Code §§ 75.28.010–75.28.380; §§ 77.32.005–77.32.280.

[5] Wash. Dept. of Game, Perm. Reg. No. 34 (1964).

[6] Wash. Rev. Code § 75.12.140 defines the permissible areas for reef net fishing. Section 75.12.010, while containing a prohibition against commercial fishing in a large salt water area, allows the director of fisheries to permit commercial fishing there within stated times and with prescribed gear. And see Wash. Admin. Code §§ 220–32–010 to 220–32–030 (Columbia River area); §§ 220–36–010 to 220–36–020 (Grays Harbor area); §§ 220–40–010 to 220–40–020 (Willapa Harbor area); §§ 220–48–010 to 220–48–060 (Puget Sound area). Commercial fishing in other areas is banned. Wash. Rev. Code § 75.12.160; Wash. Admin. Code § 220–20–010.

[7] Wash. Rev. Code §§ 75.12.060, 77.16.060.

[8] Wash. Rev. Code § 75.12.280. It appears that the monofilament type of gear (made of plastic) is less visible in clear water in daylight than the nylon web.

[9] Wash. Admin. Code § 220–48–020.

[10] Wash. Admin. Code § 220–48–020 (10).

[11] Petitioners in No. 247 argue that the Washington courts lacked jurisdiction to entertain an action against the tribe without the

The "right of taking fish at all usual and accustomed places, in common with" citizens of the Territory under a treaty with the Yakimas was involved in *United States v. Winans,* 198 U. S. 371. The lands bordering the Columbia River at those places were acquired by private owners who under license from the State acquired the right to fish there and sought to exclude the Indians by reason of their ownership. The Court held that the right to fish at these places was a "continuing" one that could not be destroyed by a change in ownership of the land bordering the river. 198 U. S., at 381. To construe the treaty as giving the Indians "no rights but such as they would have without the treaty" (198 U. S., at 380) would be "an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." *Ibid.* In *Seufert Bros. Co. v. United States,* 249 U. S. 194, the Court construed the same provision liberally so as to include all "accustomed places" even though the Indians shared those places with other Indians and with white men, rejecting a strict, technical construction not in keeping with the justice of the case.

---

consent of the tribe or the United States Government (citing *United States v. United States Fidelity & Guaranty Co.,* 309 U. S. 506, and *Turner v. United States,* 248 U. S. 354), viewing the suit as one to "extinguish a Tribal communal fishing right guaranteed by federal Treaty." This case, however, is a suit to enjoin violations of state law by individual tribal members fishing off the reservation. As such, it is analogous to prosecution of individual Indians for crimes committed off reservation lands, a matter for which there has been no grant of exclusive jurisdiction to federal courts. See, *e. g., DeMarrias v. South Dakota,* 319 F. 2d 845 (C. A. 8th Cir. 1963); *Buckman v. State,* 139 Mont. 630, 366 P. 2d 346 (1961). With respect to crimes committed by Indians within reservation boundaries, see 18 U. S. C. §§ 1153, 1162. And see § 401 (a) of Title IV of the 1968 Civil Rights Act, Pub. L. No. 90–284, 82 Stat. 78; *Seymour v. Superintendent,* 368 U. S. 351; *United States v. Celestine,* 215 U. S. 278.

It is in that spirit that we approach these cases in determining the scope of the treaty rights which the Puyallups and Nisqually obtained.

The treaty right is in terms the right to fish "at all usual and accustomed places." We assume that fishing by nets was customary at the time of the Treaty; and we also assume that there were commercial aspects to that fishing as there are at present. But the *manner* in which the fishing may be done and its purpose, whether or not commercial, are not mentioned in the Treaty. We would have quite a different case if the Treaty had preserved the right to fish at the "usual and accustomed places" *in the "usual and accustomed" manner*. But the Treaty is silent as to the mode or modes of fishing that are guaranteed. Moreover, the right to fish at those respective places is not an exclusive one. Rather, it is one "in common with all citizens of the Territory." Certainly the right of the latter may be regulated. And we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State. The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. Act of June 2, 1924, 43 Stat. 253, as superseded by § 201 (b) of the Nationality Act of 1940, 8 U. S. C. § 1401 (a)(2). But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.

In *Tulee* v. *Washington*, 315 U. S. 681, we had before us for construction a like treaty with the Yakima Indians which guaranteed the right to fish "at all usual and accustomed places, in common with the citizens" of Wash-

ington Territory. 12 Stat. 951. Tulee, a member of the tribe, was fishing without a license off the Yakima Indian Reservation; the State convicted him for failure to obtain a license. We reversed, saying:

> "[W]hile the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here." *Id.*, at 684.

In other words, the "right" to fish outside the reservation was a treaty "right" that could not be qualified or conditioned by the State. But "the time and manner of fishing . . . necessary for the conservation of fish," not being defined or established by the treaty, were within the reach of state power.

The overriding police power of the State, expressed in nondiscriminatory measures for conserving fish resources, is preserved. In *United States* v. *Winans, supra,* a forerunner of the *Tulee* case, the Court said:

> "[S]urely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as 'taking fish at all usual and accustomed places.' Nor does it restrain the State unreasonably, if at all, in the regulation of the right." 198 U. S., at 384.

Another forerunner of *Tulee* was *Kennedy* v. *Becker,* 241 U. S. 556, which also involved a nonexclusive grant of fishing rights to Indians. Indians were charged with the spearing of fish contrary to New York law, their defense being the fishing rights granted by a treaty. The Court, in sustaining the judgments of conviction, said:

> "We do not think that it is a proper construction of the reservation in the conveyance to regard it as

an attempt either to reserve sovereign prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible. Rather are we of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised." 241 U. S., at 563–564.

The use of purse seines and other nets [12] in the salt waters is permitted for commercial purposes under terms and conditions prescribed by the State; and their use in these areas is open to all, Indians as well as others. The use of set nets [13] in fresh water streams or at their mouths is barred not only to Indians but to all others.

---

[12] A purse seine is a type of gear that encircles a school of fish, lead weights taking the net down, and a boat operating at each end of the net. A line runs through rings on the bottom of the net, making it possible to close the bottom of the net. Wash. Admin. Code § 220–16–010 (15).

A gill net has a mesh which fish cannot back out of once their heads get through. Gill net fishing is drift fishing, the net being up to 1,800 feet in length. Wash. Admin. Code § 220–16–010 (8).

Purse seines and drift gill nets are used in salt water.

[13] Set gill nets are often anchored at one end, stretched on a cork line, and held down by weights, while drifting at the other end. They are often located one above another at a short distance. Fish are taken by hand out of the nets as a boat travels its length. The mesh in the gill net varies, depending on the size of the species of salmon that are running—chinook, 8 to 8½ inches; silver, chum, and sockeye, 5½ inches. Set gill nets run from 40 to 150 feet depending on the width of the river at the point they are used. Wash. Admin. Code § 220–16–010 (19).

An expert for the State testified that the reason for that prohibition was conservation:

"The salmon are milling and delaying, and especially in times of low water or early arrival of the run or for any number of reasons, the delay may be considerable.

"Once again the fish are available to the net again and again. This is the main reason for the preserve, so that the milling stock will not be completely taken.

"Then further, this is a point in the bay at the river mouth where you very definitely have a funnelling effect. The entire run is funneled into a smaller area and it is very vulnerable."

Fishing by hook and line is allowed in these areas because when salmon are "milling near the river mouth," they are not "feeding and they don't strike very well, so the hook and line fishery will take but a small percentage of the available stock no matter how hard they fish."

Whether the prohibition of the use of set nets in these fresh waters was a "reasonable and necessary" (70 Wash. 2d, at 261, 422 P. 2d, at 764) conservation measure [14] was

---

[14] Much emphasis is placed on *Maison* v. *Confederated Tribes*, 314 F. 2d 169 (C. A. 9th Cir. 1963), where another treaty right pertaining to other Indians was tendered in opposition to Oregon's power to regulate salmon fishing in the interests of conservation. This Treaty gave the Indians the right to fish off the reservation at all "usual and accustomed stations in common with citizens of the United States." *Id.*, at 170. The Court of Appeals held that Oregon could regulate the Indians' Treaty right to fish under two conditions: "*first,* that there is a need to limit the taking of fish, *second,* that the particular regulation sought to be imposed is 'indispensable' to the accomplishment of the needed limitation." *Id.*, at 172.

The idea that the conservation measure be "indispensable" is derived from *Tulee* v. *Washington, supra,* where in striking down the license fee we said that "the imposition of license fees is not

left for determination by the trial court when the Supreme Court, deeming the injunction in No. 247 too broad, remanded the case for further findings.[15]   When

indispensable to the effectiveness of a state conservation program." 315 U. S., at 685. But that statement in its context meant no more than that it would, indeed, be unusual for a State to have the power to tax the exercise of a "federal right." As stated by the Court in the sentence immediately following, the license fee "acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve." *Ibid.* Cf. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 112: "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment."

As to a "regulation" concerning the time and manner of fishing outside the reservation (as opposed to a "tax"), we said that the power of the State was to be measured by whether it was "necessary for the conservation of fish." 315 U. S., at 684.

The measure of the legal propriety of those kinds of conservation measures is therefore distinct from the federal constitutional standard concerning the scope of the police power of a State. See *Ferguson* v. *Skrupa,* 372 U. S. 726; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483; *Daniel* v. *Family Ins. Co.,* 336 U. S. 220; *Olsen* v. *Nebraska,* 313 U. S. 236.

[15] In No. 319, the parties entered into a stipulation of facts which, because of its scope, made unnecessary "the tailoring of the injunction to meet a specific situation, as in the *Puyallup* case . . . ." 70 Wash. 2d, at 280, 422 P. 2d, at 774. The Washington Supreme Court did, however, remand to the trial court with instructions to limit the injunction only to those violations of Washington law that had been stipulated to be presently necessary to the conservation of the fish runs. It was stipulated that the "usual and accustomed fishing grounds" (within the meaning of the Treaty) encompassed the Nisqually River and its tributaries downstream from the Nisqually Reservation. The parties further stipulated that the defendants had fished contrary to state fishing conservation laws and regulations since 1960; that "[i]f permitted to continue, the defendants' commercial fishery would virtually exterminate the salmon and steelhead fish runs of the Nisqually River"; and that "it is necessary for proper conservation of the salmon and steelhead fish runs of the Nisqually River . . . that the plaintiffs enforce state fishery conservation laws and regulations to the fishing activities of the defendants at their usual and accustomed grounds."

the case was argued here, much was said about the *pros* and the *cons* of that issue. Since the state court has given us no authoritative answer to the question, we leave it unanswered and only add that any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase "in common with."

*Affirmed.*