See also, D.C., 384 F.Supp. 312.

**UNITED STATES of America et al., Appellees,**

v.

**STATE OF WASHINGTON et al., Appellants.**

No. 77–1397.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1978.

Order of Submission Vacated Nov. 29, 1978.

Order Resubmitted July 2, 1979.

Decided May 18, 1981.

Dennis D. Reynolds, argued, James M. Johnson, on the brief, Olympia, Wash., for appellants.

Thomas P. Schlosser, Seattle, Wash., argued, Mason D. Morisset, Alan C. Stay and John Clinebell, Seattle, Wash., on the brief, Kathryn A. Oberly, Washington, D. C., Anne S. Almy, Dept. of Justice, Washington, D. C., on brief for U. S.

Before CHAMBERS and KENNEDY, Circuit Judges, and JAMESON,[*] District Judge.

KENNEDY, Circuit Judge:

In the protracted litigation over Indian fishing rights in the Pacific Northwest,[1] the principal decision was announced by Judge Boldt in *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).[2] The rule of the case is that the Treaty of Medicine Creek[3] grants various Indian tribes a right to an actual share of certain valuable species of fish,[4] not merely a right to the opportunity to catch fish, and that state police power regulations[5] cannot be used unduly to impair this right. The court retained continuing jurisdiction to enforce its decree.

The case before us arises from one of the orders made in the course of those proceedings. The district court enjoined the State of Washington from enforcing a certain statutory program against Indians, on the ground that the program was inconsistent with the rights granted to the Indian tribes by the court's basic decree. The state ap-peals, and we now affirm the district court's holding. 459 F.Supp. 1020.

The state action at issue concerns the operation of the so-called Buy-Back Program [BBP]. Under the BBP, the State of Washington purchases and resells commercial fishing vessels, and forbids the use of the vessels thus resold in any commercial fishing in Washington, by both Indians and non-Indians. To describe the purpose and operation of this program, we quote the trial court's own summary of its findings of fact:

"Washington limits entry into the commercial salmon fishery in order to reduce the amount of gear and the number of fishermen to ,equate better the commercial fishing effort with the available resource and thereby provide an economic benefit to the persons remaining in the fishery. State action to limit commercial fishing can take several forms, including mor[a]toria on issuance of new licenses, stratification of licenses on the basis of vessel size or duration of license, limitation of seasons, and efforts to reduce the fleet size. In 1974 the state adopted a moratorium on issuance of new commer-

---

[*] Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Conflicts between the federal treaty rights of Indians and the state police power have been before this court and the Supreme Court of Washington on many occasions. The Supreme Court of the United States has addressed the controversy in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) [*Fishing Vessel Association*]; *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) [*Puyallup III*]; *Department of Game v. Puyallup Tribe*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) [*Puyallup II*]; *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) [*Puyallup I*]; *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). *See* Note, *Fishing Vessel Association: Resolution of Indian Fishing Rights Under Northwest Treaties*, 16 Willamette L.Rev. 931 (1980).

2. *Cf. Fishing Vessel Association*, 443 U.S. at 672 n.19, 687–89, 99 S.Ct. at 3068, n.19, 3075–

77 (Court modifies method of calculating Indian share in collateral proceeding).

3. The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory....
Treaty with Nisquallys, etc., 10 Stat. 1132 ("Treaty of Medicine Creek" Dec. 26, 1854).

4. "The fish that have 'caused' this controversy are six species of anadromous fish that are among the great wonders of nature. Anadromous fish are born in fresh water streams often hundreds, and sometimes even a thousand, miles from the ocean. They go to the ocean as young fish and live most of their lives in salt water. They then return to the streams in which they were born in order to spawn. Included are five species of Pacific salmon—the chinook, the silver or coho, the pink, the sockeye, and the chum or dog salmon."
D. Getches, D. Rosenfelt, & C. Wilkinson, Cases and Materials on Federal Indian Law 625 (1979).

5. *See* 75 Wash.Rev.Code Ann. §§ 75.28.-500–.540 (1980).

cial salmon fishing licenses. The state's Buy-Back Program was developed in 1975 as another aspect of the state's program to limit commercial fishing power. The program was developed in cooperation with representatives of various segments of the nontreaty commercial fishing interests. No representatives of treaty Indian tribes were included in the groups which were set up to develop or advise on the programs. In enacting the Buy-Back Program the legislature found that there was an overabundance of commercial fishing gear in use in the state. It did not find that there was an overabundance of gear in the Indian treaty fisheries and no evidence has been offered to refute this court's prior findings that treaty Indian capability is presently below treaty entitlement level.

"The Department of Fisheries has recognized three distinct categories of salmon fisheries—commercial, recreational and Indian treaty-right fisheries. The different objectives of these distinct fisheries [have] dictated the application of separate management policies with respect to each of them.

"The Buy-Back statute and regulations expressly allow future use of vessels sold under the program in the state's recreational fishery, including use as charter vessels in that fishery. But as construed by state authorities, they prohibit use of such vessels in the treaty Indian fishery.

"Those who drew up and enacted the Buy-Back Program were aware of concern over the validity of the prohibition on use of the vessels in the treaty Indian fishery but they felt that such prohibition was necessary to retain the support of the non-Indian commercial fishing interests for the program. As enacted and implemented the program includes a prohibition against subsequent use in any commercial salmon fishery in the state or adjacent offshore waters, including the treaty Indian fishery, of vessels acquired and resold under the program. This prohibition is enforced by requiring all purchasers to sign an agreement which incorporates the restrictions against reuse,

provides for injunctive relief and imposes a $200 per day liquidated damages for such use. The Director of Fisheries stated that commercial use of such a vessel by a treaty Indian in the treaty fishery may result in the user's arrest, seizure of the vessel and forfeiture of fish.

"The Buy-Back Program is entirely funded by a grant from the Economic Development Administration of the federal government. The restrictions on future use of vessels by treaty Indians [were] not a term or condition of the grant nor was such restriction considered by the federal officials in approving the grant although they were aware of the state's restriction on subsequent use and assumed it applied to all persons, including treaty Indians. EDA's concern was with the general goal of the program; the details were decided by the state.

"Those who drew up the program anticipated that it would result in increasing the market value (price) of fishing vessels not purchased under the program. However, they did not conduct any studies on the effect of such increase or reduced open market availability of such vessels on the Indians' future efforts to acquire vessels and gear necessary to increase their ability to exercise their treaty right as decreed by this court.

"A major short-term effect of the program is to enable vessel owners to obtain a substantially higher price for their vessels from the state than they could obtain on the present private market. Because the present demand for construction of new gillnet fishing boats exceeds the supply, it was not possible to obtain a new boat during the 1976 fishing season.

"After purchase by the state the vessels are stripped of their gear and offered for resale through public auction. The resale prices are for the most part considerably less than the price at which they were purchased by the state. This is due in large measure to the restrictions against relicensing and reuse. Where the vessels are purchased by out-of-state buyers for out-of-state commercial fishing use, the

high quality ones have brought from 80% to 110% of the state's purchase cost. "When purchasing vessels under the Buy-Back Program the state must also purchase and permanently retire all current Washington commercial fishing licenses and delivery permits issued to the vessel or its owner. The boat may not be relicensed for commercial fishing or delivery and under the state's license moratorium laws the repurchaser from the state cannot obtain a new license.

"Commercial use of these vessels by treaty Indians in their treaty fisheries would not defeat the purposes of the Buy-Back Program but would increase the economic opportunity of treaty fishermen. There is no conservation purpose, as previously defined by this court, for imposing a restriction on subsequent use of the vessel in the treaty Indian fishery.

"A survey undertaken by the Northwest Indian Fisheries Commission disclosed that at least 87 treaty fishermen from 11 treaty Indian tribes will seek to purchase used fishing boats from the state's Buy-Back auctions if there are no waivers of, or restrictions on, use of the boats for treaty-right fishing and that at least 71 treaty Indian fishermen have sufficient funds to purchase a used commercial fishing boat but will not have sufficient funds to purchase a new boat.

"At least two identified treaty Indians have purchased vessels at the first two state auctions for intended commercial use in their treaty fishery."

*United States v. Washington,* 459 F.Supp. 1020 (W.D.Wash.1978) (Phase I—Compilation of Major Post-Trial Substantive Orders (Through June 30, 1978)); *id.* at 1090–91 (Order Re: State "Buy-Back" Program (Dec. 22, 1976)). *See also* Record at 339–65 (detailed Findings of Fact and Conclusions of Law).

The trial court held that the controversy was within its continuing jurisdiction, and that the BBP violated the Indians' Treaty rights. The latter conclusion was based on the following predicates: the BBP failed to recognize the special status of treaty rights;

it discriminated against the Indians by allowing BBP vessels to be used in the sport fishery but not the Indian commercial fishery; and the BBP was not so closely tailored to permissible conservation purposes as to justify its application to Indians who were exercising their treaty rights. By way of remedy, the court declared the contractual restrictions on use of the BBP vessels void as applied to Indian purchasers, and held the various statutory enforcement mechanisms, which authorized forfeiture and penal sanctions, inapplicable to Indians.

## I. Prior Proceedings and Issues on Appeal

Both the United States and the State of Washington moved for summary judgment; each side submitted proposed findings of fact and conclusions of law, and each side responded to the submission of the other. Our review of this point in the proceedings is made easier, perhaps deceptively easy, by the State's position at trial and on appeal. The State responded to appellee's proposed findings and conclusions only in a very general and conclusory way. The trial court relied substantially on the Government's submission, but by no means adopted it verbatim. *Cf. Photo Elecs. Corp. v. England,* 581 F.2d 772, 776–77 (9th Cir. 1978) (standard of appellate review when trial court merely adopts proposed findings of prevailing party). We are satisfied that the trial court's findings of fact are supported by an adequate independent examination of the affidavits and other materials before it. Nevertheless, our review would be facilitated had the appellants participated more actively in the attempt to sort out non-material factual issues and sharply focus any remaining material issues of triable fact. *See Garter-Bare Co. v. Munsingwear, Inc.,* 622 F.2d 416, 424–25 (9th Cir. 1980) (concurring opinion).

Conclusions designated as a trial court's findings of fact on a grant of summary judgment are ordinarily "entitled to no deference on review." *Id.* at 425. In this case, however, the appellants have raised no significant and specific objection to appellees' proposed findings at trial, and there is no

contention on appeal that the issues were inappropriate for summary judgment. We therefore accept and adopt the trial court's findings in their entirety.

This having been said, the only question for our review is legal and two-fold: given the nature of the treaty fishing rights as interpreted by controlling federal decisions, and given the effects and operation of the BBP as described by the district court, do the use restrictions exceed the state's regulatory authority when applied to Indians, and do the restrictions have the effect of impairing the Indians' exercise of their treaty rights?

The relation between these two questions is, unfortunately, neither clear nor simple. In 1979 the Supreme Court settled a long-standing controversy over the extent of the rights reserved by the Treaty—whether the Treaty conferred only a right of access, in common with other non-Indian residents, to fishing areas, or some more substantial right. The Court declared:

> But we think greater importance should be given to the Indians' likely understanding of the other words in the treaty and especially the reference to the "right of *taking* fish"—a right that had no special meaning at common law but that must have had obvious significance to the tribes relinquishing a portion of their pre-existing rights to the United States in return for this promise. This language is particularly meaningful in the context of anadromous fisheries—which were not the focus of the common law—because of the relative predictability of the "harvest." In this context, it makes sense to say that a party has a right to "take"—rather than merely the "opportunity" to try to catch—some of the large quantities of fish that will almost certainly be available at a given place at a given time. .... Because the Indians had always exercised the right to meet their subsistence and commercial needs by taking fish

from treaty area waters, they would be unlikely to perceive a "reservation" of that right as merely the chance, shared with millions of other citizens, occasionally to dip their nets into the territorial waters. Moreover, the phrasing of the clause quite clearly avoids placing each individual Indian on an equal footing with each individual citizen of the State. The referent of the "said Indians" who are to share the right of taking fish with "all citizens of the Territory" is not the individual Indians but the various signatory "tribes and bands of Indians" listed in the opening article of each treaty. Because it was the tribes that were given a right in common with non-Indian citizens, it is especially likely that a class right to a share of fish, rather than a personal right to attempt to land fish, was intended.

In our view, the purpose and language of the treaties are unambiguous; they secure the Indians' right to take a share of each run of fish that passes through tribal fishing areas. But our prior decisions provide an even more persuasive reason why this interpretation is not open to question. For notwithstanding the bitterness that this litigation has engendered, the principal issue involved is virtually a "matter decided" by our previous holdings.

*Fishing Vessel Association,* 443 U.S. at 678–79, 99 S.Ct. at 3071. Therefore, the extent of any impairment to Treaty rights must be measured against the Treaty entitlement when defined as a reserved portion of harvestable fish.

The other issue, *i. e.,* the extent of the State's regulatory authority as applied to Indians, is more complex. Although in 1968 the Court appeared to read the State's regulatory power rather broadly, notwithstanding the federal treaty rights,[6] more recently the Supreme Court has stated that there must be a close fit between a state regulation and a conservation purpose

---

**6.** In *Puyallup I,* Justice Douglas suggested that a state regulation that restricted an Indian's exercise of his fishing rights would be permitted even if it was not "indispensable" to the

attainment of a conservation purpose. *Puyallup I,* 391 U.S. at 401–02 & n.14, 88 S.Ct. at 1730 & n.14.

served thereby before the supremacy clause will permit the regulation to be applied to Indians in a way that restricts exercise of their treaty fishing rights.[7] We are confident that, at a maximum, state police power in respect to treaty fishermen does not reach so far as to allow Washington to attain a conservation goal by choosing a means that burdens the exercise of Indian fishing rights in a substantially greater way than would alternate means of attaining the same goal.

As noted earlier, the defendants do not attack particular findings or conclusions of the trial court specifically or cogently. Three arguments are mentioned in passing in their opening brief. First, they argue that the BBP use restriction is different from the type of restrictions in earlier cases, since it is only a condition on the use of property purchased from the government, and it serves a legitimate purpose. Whether or not these contentions are true, they do not directly and adequately respond to the proper questions controlling the case, namely, do the use restrictions and penal sanctions including imprisonment exceed the state's power as limited by the federal treaty, and do they impermissibly hinder the Indians' harvest of their share of the fish.

The State's second argument is that to allow Indians to purchase BBP vessels at bargain prices and then to require the State to permit them to use the vessels in a lucrative fishing business is either unconscionably to force the State to subsidize Indian fishing or unconstitutionally to mandate the dedication of public property to private use. This claim misconceives both the nature of the Indians' right and the true quality of the State's action. As it requires discussion of the economic conditions in Washington's fishing industry, it will be addressed below.[8]

Finally, the State seems to argue that the district court's order is impossible to administer. The thought is that Ruling 7 of the original decree, see 384 F.Supp. at 410, would make the allocation of fish caught by Indians for commercial purposes with BBP vessels ambiguous. As that ruling does not survive the Supreme Court's latest word in *Fishing Vessel Association*, 443 U.S. at 687–89 & n.29, 99 S.Ct. at £ 75–77 & n.29, it no longer poses a problem.

In both their opening and reply briefs, appellants raise a litany of arguments that are as familiar as they are misguided. To wit, that the order below violates equal protection in that it treats Indians preferentially and impermissibly exceeds the judicial deference to legislative policy judgments observed in economic substantive due process and equal protection cases. These arguments. have no merit. *See Fishing Vessel Association*, 443 U.S. at 673 n.20, 99 S.Ct. at 3068 n.20; *Puyallup I*, 391 U.S. at 401–03 & n.14, 88 S.Ct. at 1730–31 & n.14.

Having said all this, a charitable reading of the defendants' briefs presents us with a more fundamental if less clearly articulated question: How can a regulatory program,

7. "Although nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that *required* for conservation." *Fishing Vessel Association*, 443 U.S. at 682, 99 S.Ct. at 3073 (emphasis added) (footnote omitted). The distinction, if any, between what is "indispensable" and what is merely "required" is not material to our analysis.

The relation between the sphere of state police power and that of immune treaty right has generated many opinions. *See* Bean, *Off-Reservation Hunting and Fishing Rights: Scales Tip in Favor of States and Sportsmen?*, 51 N.Dak.L.Rev. 11 (1974); Dein, *State Jurisdiction and On-Reservation Affairs*: Puyallup Tribe v. Dep't of Game, 6 Envt'l Aff. 535 (1978); Johnson, *The States Versus Indian Off-Reservation Fishing: A United States Supreme Court Error*, 47 Wash.L.Rev. 207 (1972); Note, *Indian Treaty Analysis and Off-Reservation Fishing Rights: A Case Study*, 51 Wash.L.Rev. 61 (1975); ·Comment, *State Power and the Indian Treaty Right to Fish*, 59 Calif.L.Rev. 485 (1971); Comment, *State Regulation of Indian Treaty Fishing Rights: Putting* Puyallup III *into Perspective*, 13 Gonz.L.Rev. 140 (1977). In any event, we believe that all the relevant federal decisions and academic commentators we have cited are consistent with the thesis that the sphere of state police power is no greater than that delineated in text.

8. *See*, pp. 755–756, 756 n.15 *infra*.

the ostensible goal of which is to reduce overcrowding in the commercial fishery, be construed not only as a positive impediment to Indian fishing, but also transmuted into an affirmative requirement to subsidize Indians in addition to buying out non-Indians?

## II. Legal Significance of the Buy-Back Program (BBP) in Light of the Treaty of Medicine Creek

Our appraisal of the purpose, operation, and effects of the BBP requires some discussion of economic conditions in Washington's commercial fishing industry as these both motivated and were in turn altered by Judge Boldt's original decision and by the BBP.

The district court in the present action made several findings pertaining to the changing economic conditions in the Washington fishing industry. *See* Findings of Fact Nos. 15, 24, 25, 34, 36, 37, 38, 40, 42, 46, 47, 49; Record at 340–41, 343, 345, 347–50. These are summarized above. *See* pp. 750–752 *supra.* Our review of the record shows the court relied most heavily on the testimony of three experts: Donald Moos, Director of the [Washington] Department of Fisheries, and James Goldade and Gerry Johnson, two appraisers employed by the State to assist in determining how much the State should offer for boats bought and resold through the BBP.

Based on the findings of the trial court and our own independent examination of these materials, one can discern three phases of economic conditions in the fishing and fishing gear industry in the case area. These phases are a simplification, but are more than adequate for our narrow purpose of explaining the cause and effect relations that underlay the trial court's findings.

Before Judge Boldt's decision in 1974, non-Indian commercial and sports fisher-men harvested the resources of the case area to the virtual exclusion of Treaty Indians.[9] The market for commercial fishing vessels, both new and used, was predominantly non-Indian commercial fishermen. The value of new and used boats at this time reflected the lucrative extent of the non-Indian fishery. The 1974 decision inaugurated the second phase. The non-Indian commercial fishery, the principal source of capital for investment in new and used vessels, was drastically curtailed in the proportion of harvestable fish it was allowed to take.[10] This curtailment led automatically to an excess of non-Indian commercial fishermen in relation to the volume of fishing business permitted, and similarly to a sharp drop in the value to non-Indian commercial fishermen of new and used vessels and other gear.[11] As a result of this and of increased demand for new vessels in Alaska, the supply of new boats in Washington dried up.[12] Although Treaty Indians wishing to enter the commercial fishing business would presumably be more able to afford used fishing gear after the price fell in response to the 1974 decree, at this point the State stepped in, and in so doing began the third phase. With the announced purposes of pruning excess gear from an overcrowded commercial fishery and of providing economic relief to those non-Indian commercial fishermen whose businesses and gear suffered a steep devaluation after the 1974 decision, Washington established the Buy-Back Program [BBP] in 1975. Millions of dollars in federal funds were obtained to finance this program.

One particular feature of the BBP is critical for our purposes. As noted, the relative prosperity of the non-Indian commercial fishery had been predicated on what was in 1974 determined to be an illegally large share of the harvestable fish runs.

9. *See Fishing Vessel Association,* 443 U.S. at 676–77 & n.22, 99 S.Ct. at 3069–70 & n.22. The original compilation of the data on which the Supreme Court and the district court relied was performed by the United States Fish and Wildlife Service. *See* Brief of Intervenor-Appellees Appendix C.

10. *See* Note, *supra* note 7, 51 Wash.L.Rev. at 92 n.167; Johnson Deposition at 24 (quoting grant application).

11. *See* Goldade Deposition at 13–14, 19–20; Johnson Deposition at 28–29.

12. *See* Goldade Deposition at 49.

The State of Washington intended to, and did, provide relief for the non-Indians adversely affected in the value of their gear and business by entering the marketplace and buying boats at a value that the vessels would have had prior to the 1974 decision: in effect, the State bid the price of gear back toward the earlier high value.[13] The ultimate effect was to create a two-tiered market for used fishing vessels. A Treaty Indian wishing to buy a boat could either buy a BBP vessel at a bargain price, but suffer statutory penalties if he attempted to use it commercially in Washington, or else compete with the State's BBP to buy boats without a use restriction at a price inflated back toward the pre-1974 value which had been predicated on an illegal share of harvestable fish. This case arose because certain Indians chose the former course with the intention of violating the use restriction.

In light of the findings of the trial court, as explained by the preceding discussion, we must decide whether applying the use restriction to Treaty commercial fishermen exceeds the police power permitted by the Treaty or impermissibly hampers the exercise of Treaty rights.

We note first of all that the State failed to specify what conservation purpose was served by applying the use restriction to Indians.[14] The purpose of reducing the size of the commercial fishery is inapposite here. First, the size of the permitted non-Indian commercial harvest was already reduced by enforcement of the 1974 decision itself. The use restriction only alleviated the hardship to non-Indian fishermen of compliance with the decision, and increased the aggregate efficiency of the non-Indian fishery. Obviously, applying the use restriction to Indians would be irrelevant to the purpose of reducing exploitation of the non-Indian one-half share of the resource. Secondly, reducing the Indian exploitation of the commercial Treaty fishery is not a permitted conservation purpose because the Indian fishery was and has continued to be underexploited due to a shortage of gear among Treaty fishermen.

Applying the BBP's use restriction to Indians is not required for a permissible conservation purpose, and it affirmatively hinders the exercise of Treaty rights. The policy discriminates against Indians because the use restriction is not applied to the large sport-fishing industry. Second, the State intervention reversed the decline of prices in the used fishing vessel market; this decline would to some extent have increased Indian access to commercial fishing gear as a natural result of the 1974 decree. Last, the State in formulating the Buy-Back Program failed to treat the interests of the Indian commercial fishery as co-equal to the non-Indian fishery.[15]

Because application of the use restriction and concomitant statutory penalties to Treaty Indians is not required for conservation and impermissibly hinders the exercise of Treaty rights guaranteed by the supremacy clause, the order below is AFFIRMED.

---

**13.** *See* Johnson Deposition at 24, 35–36, 39–40; Goldade Deposition at 16, 19–20, 36–37.

**14.** *See* Defendants' Answer to Plaintiffs' Interrogatory No. 6, Record at 93. The very brief legislative history is found in Journal of the Senate, 44th Legislature, Regular-1st Ex.Sess. 1266–67 (Fifty-Fourth Day, May 6, 1975); and Journal of the House, 44th Legislature, Regular-1st Ex.Sess. 1585–86 (Seventy-Fifth Day, May 27, 1975).

**15.** As noted earlier, the appellants argue that the subject order forces them in effect to subsidize the gearing-up of Treaty Indians. The simplest response to this is to note that nothing requires the State to purchase the boats at prices inflated beyond the post-1974 decision value. Similarly, it could be argued that nothing prevents the State from selling the vessels to non-Indians at bargain prices due to the use restriction, and selling them to Indians at intermediate prices without the restriction, reflecting the fair market value during the second phase described in text, *see* pp. 754–755 *supra*. This exemplifies our earlier observation that the supremacy clause requires, at a minimum, that the State choose the less adverse of two alternative regulatory measures if the regulation is to be applied to Treaty fishing.