Argued and submitted January 27, affirmed September 10, reconsideration denied December 19, 1986, petition for review denied January 21, 1987 (302 Or 571)

## STATE OF OREGON,
*Respondent,*

*v.*

## WARNER JIM,
*Appellant.*

## (CR 82-315; CA A33716)

725 P2d 365

Jack L. Schwartz, Portland, argued the cause and filed the brief for appellant.

Linda DeVries Grimms, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren· and Rossman, Judges.

BUTTLER, P. J.

Rossman, J., specially concurring.

## BUTTLER, P. J.

Defendant was convicted of the sale of food fish during a closed commercial season, in violation of ORS 509.011, which makes it "unlawful to: [b]uy, receive, possess or sell food fish unlawfully caught during a closed season." ORS 509.011(2)(a). Defendant, a member of the Yakima Indian Nation, admits that, on April 28, 1982, he caught salmon from the Columbia River, which he later sold at Celilo Indian Village to an undercover special agent for the National Marine Fisheries Service, and that, on that date, the commercial fishing season was closed.

The fish were caught pursuant to a ceremonial fishing permit issued by the Warm Springs tribe,[1] which authorized sale of fish only to the tribe. Any sale to others violated Warm Springs tribal law. If the fish were caught for ceremonial purposes only, they were lawfully caught; if, however, they were caught for commercial purposes, they were unlawfully caught within the meaning of ORS 509.011. Defendant assigns no error to the sufficiency of the evidence to establish that the fish were unlawfully caught. He concedes that he caught the salmon when the season was closed to commercial fishing and that he sold them to undercover agents, which was in violation of state law.[2]

His principal contention, and the only one on which we write,[3] is that the state may not assert jurisdiction over him to enforce violation of state fishing regulations, because he was exercising his rights under the 1855 treaty with the Yakima tribes. The state contends that, because the fish were unlawfully sold, it may assert its jurisdiction for either of two reasons: (1) defendant was not acting in compliance with Warm Springs tribal laws and was not, as a consequence, protected by the Yakima treaty fishing rights; and (2) the state may regulate treaty fishing when the regulation is

---

[1] The ceremonial permit was issued to defendant's stepson, Lyman Jim, who, along with defendant's wife, Melinda Jim, is a member of the Warm Springs Confederated Tribes. The permit listed three helpers for Lyman, including Melinda. Defendant was not named on the permit, but the state concedes that he was permitted to fish pursuant to it.

[2] State regulations established a closed commercial fishing season on April 28, 1982, making sale of the fish unlawful.

[3] He asserts 12 assignments of error, only one of which we address.

reasonable and necessary for conservation purposes and is nondiscriminatory, and those requirements are met here.

In 1855, the United States entered into a treaty with the Yakima tribes, under which the tribes ceded to the United States their right and title to a substantial portion of their lands in exchange for the present reservation lands and some nominal consideration, reserved hunting and fishing rights on the reservation and also reserved "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory * * *." Treaty with the Yakima Nation of Indians, Art III, 12 Stat 951 (signed June 9, 1855; ratified by the Senate March 8, 1859; proclaimed by the President April 18, 1859). The "right of taking fish" includes the right to sell fish commercially. *See Sohappy v. Smith,* 302 F Supp 899 (D Or 1969).

■    Celilo Indian Village, where defendant sold the fish, is a "usual and accustomed place" where Columbia River treaty Indians, including Yakimas, may exercise their treaty rights.[4] Because the fishing rights at those sites are held "in

---

[4] Defendant argues that Celilo is an Indian reservation where the state is precluded from exercising its jurisdiction. In 1947, because of destruction of usual and accustomed fishing sites by construction of the Bonneville Dam, the United States government purchased the Celilo tract to be held

> "in trust * * * for the use of the Yakima Indian Tribes, * * * the Confederated Tribes of the Warm Springs Reservation, and other Columbia River Indians affiliated with the aforementioned tribes and entitled to enjoy fishing rights at their old and accustomed fishing sites at or in the vicinity of Celilo Falls on the Columbia River." 61 Stat 466 (1947).

The term "Indian reservation" is not defined by statute. When land is declared by Congress to be held in trust by the federal government for the benefit of Indians, it is generally considered a "reservation." *See United States v. John,* 437 US 634, 649, 98 S Ct 2541, 57 L Ed 2d 489 (1978); *United States v. Pelican,* 232 US 442, 449, 34 S Ct 396, 58 L Ed 676 (1914). The Ninth Circuit found that Celilo is a "reservation" for purposes of federal prosecution under the Lacey Act, 16 USC § 3372, which permits the federal government to prosecute violations of federal, state and tribal wildlife laws. *United States v. Sohappy,* 770 F2d 816 (9th Cir 1985), *cert den* 106 S Ct 3278 (1986).

Although Celilo may be a reservation in the general sense, it seems clear that it is not a part of the reservation of any particular tribe. In some instances, the preferential treatment accorded reservation fishing is the result of treaties that reserved *exclusive* fishing rights on reservations, in which cases we assume that the state may not assert its jurisdiction. However, Celilo, by statute, is land held in trust by the United States for use by tribes "entitled to enjoy fishing rights at their old and accustomed fishing sites at or in the vicinity of Celilo Falls * * *." 61 Stat 466 (1947). Here, the reserved fishing rights at usual and accustomed places are held "in common with" nontreaty fishers; therefore the analysis of the state's jurisdiction over events occurring at Celilo is the same as that at other, off-reservation, usual and accustomed sites. In any event, in *Puyallup Tribe v. Washington Game Dept.,* 433 US 165, 97 S Ct 2616, 53 L Ed 2d

common with" other citizens, states may regulate Indian fishing there, but only when the regulation is necessary for conservation, "provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup Tribe v. Dept. of Game,* 391 US 392, 398, 88 S Ct 1725, 20 L Ed 2d 689 (1968) (*Puyallup I*). To meet the appropriate standards, "the State must demonstrate that its regulation is a reasonable and necessary conservation measure, *and* that its application to the Indians is necessary in the interest of conservation." *Antoine v. Washington,* 420 US 194, 207, 95 S Ct 944, 43 L Ed 2d 129 (1975). (Citations omitted; emphasis in original.) Therefore, the three requirements which the state must prove before it may assert jurisdiction over Indian treaty fishers at usual and accustomed sites are that (1) the regulation is a reasonable and necessary conservation measure; (2) the application of the specific regulation to treaty fishers is necessary in the interest of conservation, and (3) the regulation does not discriminate against treaty fishers.[5]

■ Here, the record contains no evidence in support of its jurisdiction over treaty fishers. The state was somewhat ambivalent as to whether proof of a conservation purpose was necessary.[6] However, it did offer to produce a document

---

667 (1977) (Puyallup III), the Supreme Court applied the conservation purpose analysis to on-reservation fishing by treaty Indians when the fishing rights on the reservation were not exclusive to Indians.

[5] *See State v. Jim* (Bruce), 81 Or App 189, 725 P2d 372 (1986), for a more complete discussion of what is meant by "reasonable and necessary" and "conservation."

[6] Although the state now relies on *State v. Gowdy,* 1 Or App 424, 462 P2d 461 (1969), to support its argument that it need not prove a conservation purpose when a treaty Indian is fishing in violation of tribal law, it did not do so below. We need not decide here whether *Gowdy* was correctly decided or whether, if it was, it remains viable. We note, however, that in *United States v. Sohappy, supra* n 4, the defendant had violated both state and tribal law. The federal government sought to prosecute for both violations under the Lacey Act, which provides that

"(a)  * * *

"It is unlawful for any person—

"(1)  to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law;

"(2)  to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—

entitled "A Plan for Managing Fisheries on Stocks Originating from the Columbia River and its Tributaries above Bonneville Dam" (The Plan),[7] which had been drawn up and consented to by Oregon and Washington and by the tribes and had been approved by the federal court, which had retained jurisdiction over Indian treaty fishing rights in that area. *United States v. Oregon*, Civil No. 68-513, *supra* n 7. That

---

"(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any state * * *." 16 USC § 3372.

Notwithstanding the defendant's violation of tribal laws, the court held that, in order for the federal government to enforce state law pursuant to the Lacey Act, it first had to establish that the state regulation was valid as applied to treaty fishers, applying the same test that would apply if the state were enforcing it. 770 F2d at 823-24. The specially concurring opinion would hold that *Gowdy* is correct and governs here, notwithstanding *Sohappy*, which it says is wrong.

Even if *Gowdy* is correct, it is not applicable here. In *Gowdy*, this court held that a treaty Indian fishing in violation of his tribe's regulations is "acting outside of the treaty rights" and therefore is unprotected by them. 1 Or App at 431. Unlike in *Gowdy*, defendant here is a member of a tribe (Yakima) other than the one whose tribal laws were violated. There is no evidence that defendant violated Yakima tribal law, only that of the Warm Springs Confederated Tribes. Although there may be provisions for inter-tribal enforcement of tribal regulations, especially when a treaty Indian is fishing under another tribe's permit, neither party addresses that issue.

More to the point, defendant asserts a treaty right, not a right under tribal laws; it is the treaty right that triggers the necessity of the state to establish the conservation purpose of its regulation in order to enforce it against treaty Indians. The specially concurring opinion insists that defendant must assert that a tribal right permitted his actions and, if he does so, the state must prove beyond a reasonable doubt that tribal regulations forbade what defendant did. 81 Or App at 187. Apparently, the question would be for the jury, which is an odd way to resolve what has been characterized as a jurisdictional question for the court. That approach ignores the long history of litigation involving a state's effort to enforce its regulations against treaty Indians.

[7] In *United States v. Oregon*, Civil No. 68-513, District of Oregon, reported as *Sohappy v. Smith*, *supra*, a consolidated case that challenged the validity of certain Oregon fishing statutes and regulations as being contrary to treaties of the United States, the federal court clarified the limits on state regulation of treaty fishing, and retained continuing jurisdiction over the Columbia River fisheries. The Plan referred to in the text was an outgrowth of that case whereby, in 1977, the states of Oregon and Washington, the Warm Springs, Yakima, Umatilla and Nez Perce tribes entered into a five-year plan for managing fisheries in the Columbia River system. That Plan was approved by and became an order of the federal District Court for the District of Oregon on February 28, 1977. Paragraph (9) of The Plan provides:

"Regulations affecting treaty users which are enacted in conformity with this comprehensive plan shall be considered as complying with the court's decrees enunciated in *U. S. v. Oregon*, Civil No. 68-513, District of Oregon."

As noted in *United States v. Sohappy*, *supra* n 4, The Plan, by itself, does not meet the requirements imposed on the state to establish a conservation purpose. The regulation must be in conformity with The Plan.

document was not received in evidence, because, apparently, the trial court stated that it could take judicial notice of it, if necessary. The record does not disclose whether the trial court did so.

However, since the trial of this case, *United States v. Sohappy, supra* n 4, was decided, affirming a conviction entered before this trial. That case involved a prosecution under the Lacey Act for fishing during the same closed commercial season under Oregon law as is involved here. The court held that the closure of Columbia River commercial fishing during the spring of 1982 was reasonable and necessary for conservation, and was valid as applied to treaty fishers through Lacey Act federal prosecutions. The court, after discussing The Plan, stated:

> "The states set the 1982 commercial fishing season via the Columbia River Compact, an interstate agency controlling commercial fishing on the Columbia River. The Compact received recommendations from the Washington and Oregon fisheries departments that explained that the seriously depressed upriver spring chinook run required that there be no spring 1982 commercial fishing season.

> "It is especially significant that the Columbia River Intertribal Fish Commission, representing the treaty tribes, agreed with that recommendation stating that it 'recognizes that the 1982 upriver spring chinook run will be a record or near-record low. [Thus,] no commercial harvest of these fish can be justified.' The Yakima and Warm Springs tribes concurred. The Columbia River Compact accepted the recommendations and closed the fishery for the spring of 1982 saying that the closure was 'reasonable and necessary for conservation' and that there was no 'less restrictive alternative.' We conclude that the government has adequately established the validity of the 1982 spring season ban adopted by the Compact." 770 F2d at 824.

Here, the trial court recognized that it was necessary that it be established that the regulation sought to be enforced met the requisite conservation purpose standards. However, it stated that, once the United States District Court in Oregon approved a particular regulation of fishing on the Columbia pursuant to The Plan, *see* n 7, *supra,* that court's determination controlled, relieving the state of its burden to make that showing. Although the trial court's discussion evidenced a thorough familiarity with the history of the problem and of

the documents involved in solving it, the court did not, in so many words, state that it was taking judicial notice of them.

It is apparent from *United States v. Sohappy, supra* n 4, that the regulation here involved had been approved by the United States District Court in Oregon and had been held by the trial court in that case to meet the requisite conservation standards before the trial of this case. Because such matters are the subject of judicial notice, OEC 201, and because the question of the state's authority to prosecute defendant is a question of law, there is no reason to remand to permit the trial court to take judicial notice. This court may do so and is bound by the court's determination in *United States v. Sohappy, supra* n 4.

Affirmed.

**ROSSMAN, J.,** specially concurring.

I . agree that defendant's conviction should be affirmed. I do not, however, agree with significant portions of the majority's reasoning and therefore write separately. Defendant caught fish during a closed season[1] under a Warm Springs tribal permit which allowed him to catch fish only for ceremonial purposes and to sell them only to the tribes. He violated the terms of the permit by selling the fish commercially. He thereby violated ORS 509.011, unless some tribal right protects him from state prosecution.[2] Because his actions were beyond the authority which the tribal permit granted, he has no tribal immunity. He is therefore subject to state law. That is where this case should end. The existence of a conservation necessity, which is the focus of the majority opinion, is simply irrelevant. *State v. Gowdy,* 1 Or App 424, 462 P2d 461 (1969).

The majority, relying in part on *United States v. Sohappy,* 770 F2d 816 (9th Cir 1985), assumes that the state must show a conservation necessity for the closure of the season in order to justify its prosecution of defendant. It then

---

[1] The relevant states and Indian tribes had all closed the season except for Indian ceremonial fishing.

[2] ORS 509.011(2)(a) provides that it is unlawful to "sell food fish unlawfully caught during a closed season." Defendant does not argue that he caught the fish lawfully under the tribal permit and that his subsequent sale of the fish outside the limitations of the permit did not violate this statute. As the majority notes, he assigns no error to the sufficiency of the evidence to establish that the fish were unlawfully caught.

strains to find proof of such a necessity in the record of this case. In doing so, it compounds the Ninth Circuit's apparent misunderstanding of the relevant Supreme Court cases. Those cases do not protect from state prosecution tribal members who hunt or fish in violation of tribal regulations.

Many Indian tribes have reserved hunting and fishing rights which are protected in treaties and other federal agreements or enactments. The tribes and their members are, in almost all circumstances, immune from state regulation in exercising those rights. *See Antoine v. United States,* 420 US 194, 204, 95 S Ct 944, 43 L Ed 2d 129 (1975). The only exception so far recognized is that a state may override Indian off-reservation (and possibly on-reservation) rights if there is a conservation necessity for it to do so. *See New Mexico v. Mescalero Apache Tribe,* 462 US 324, 103 S Ct 2378, 76 L Ed 2d 611 (1983); *Puyallup Tribe v. Washington Game Dept.,* 433 US 165, 97 S Ct 2616, 53 L Ed 2d 667 (1977); *Antoine v. United States, supra,* 420 US at 207; *see also Washington Game Dept. v. Puyallup Tribe,* 414 US 44, 49, 94 S Ct 330, 38 L Ed 2d 254 (1973) ("[T]he Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.")

Those cases, like other Supreme Court cases in which state regulation of Indian fishing or hunting was relevant to the decision, involved fishing or hunting *which was legal under tribal law.* The question the Court faced was, therefore, whether the state could prohibit Indian fishing and hunting in the face of the tribe's action permitting it. *See, e.g., Puyallup Tribe v. Washington Game Dept., supra; see also State v. Reed,* 92 Wash 2d 271, 595 P2d 916, *cert den* 444 US 930 (1979). The Court therefore had to consider whether a conservation necessity justified the state conviction of a tribal member who was exercising a tribal right in accordance with tribal law. It did not decide whether such a necessity is relevant to a state's prosecution when the tribal member has violated tribal as well as state law and is therefore not exercising a tribal right.

To the extent that *United States v. Sohappy, supra,* supports the majority's position, its language is both dictum and incorrect.[3] *Sohappy* involved a federal prosecution of

---

[3]The majority states that we are bound by the Ninth Circuit's *Sohappy* decision, because the issue is one of federal law. This statement is incorrect. Although we give

Indians for fishing in the Celilo area in 1982, during the same closed season during which defendant fished. The defendants were convicted of violating the Lacey Act, which prohibits transporting, selling or acquiring fish taken or possessed in violation of tribal or state law. 16 USC § 3372(a). The defendants conceded that they had violated tribal law. The Ninth Circuit held that Congress intended the act to apply to Indians who violated tribal law within "Indian country." That holding was sufficient to support the defendants' convictions. However, because the defendants had *also* violated state law, the court went on to determine whether the state regulations were reasonable and necessary for conservation purposes.[4] The only case it cited for the need to make that determination was *State v. Reed, supra.* It did not note that the defendant in *Reed* claimed to be acting in conformity with tribal law and that the Washington court did not reach that claim. The *Sohappy* language is an unnecessary and unsupported extension of the conservation necessity requirement from an area where it is appropriate to one where it is not.

Some basic principles of Indian law provide a clear and simple resolution of this case. Indians have rights superior to state law, not because they are Indians, but because they are members of federally-recognized, quasi-sovereign tribes, with a particular political status resulting from that membership. *See Morton v. Mancari,* 417 US 535, 554, 94 S Ct 2474, 41 L Ed 2d 290 (1974). In a sense, they have a triple citizenship, members of the tribe, citizens of their state and citizens of the

---

considerable weight to decisions of federal courts of appeal on issues of federal law, we are no more bound to follow a decision of the Ninth Circuit than is the First Circuit or the Eleventh Circuit. The ultimate authority on federal questions is the United States Supreme Court. When we disagree with the Ninth Circuit's interpretation of Supreme Court decisions, we must follow what we believe to be the controlling law, rather than perpetuate a misreading of it.

[4]The court in *United States v. Sohappy, supra,* 770 F2d at 823, quoted from *Puyallup Tribe v. Washington Game Dept.,* 391 US 392, 398, 88 S Ct 1725, 20 L Ed 2d 689 (1968), that

"* * * the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indian."

It is obvious that the Supreme Court was discussing state regulations which limited the *tribes'* right to exercise their reserved rights. It is equally obvious that these limits on state authority have no application to an *individual Indian* who fishes or hunts in violation of tribal law.

United States. The tribes, as political entities, have certain reserved rights with which the states may not interfere; those rights vary from tribe to tribe and are often based on 19th Century treaties or other agreements with the federal government.

For that reason, a state hunting or fishing law does not apply to an Indian who is exercising a tribal right unless there is a conservation necessity.[5] That right, however, belongs to the tribe as a political entity, not to an individual Indian. If the tribal government adopts regulations which limit or forbid the exercise of a tribal right by its members, it is nonsense to say that an Indian who acts in violation of those regulations has any tribal protection in doing so. By its regulation, the tribe has prohibited the individual's action and may have imposed sanctions on it. The tribe has thereby stated that it has no interest in defending what its individual member did. The Indian is no longer functioning in the political status of a member of the tribe but in the status only of a citizen of the state. The Indian is therefore subject to the same state-imposed restrictions as is any other citizen.[6] Defendant has no treaty right to assert if his actions violated tribal law. This basic concept—that tribal rights do not belong to individuals—is something the majority fails to accept and is the heart of its error. *See* 81 Or App at 181 n 6.

Those principles lead to a clear procedure for prosecution. An Indian who is accused of violating a state hunting or fishing regulation may assert in defense that a tribal right permitted what the Indian did. A necessary foundation for that assertion is that the tribe recognizes the Indian's actions as being an exercise of a tribal right. If the Indian makes such a defense, the state may then show, by proof beyond a reasonable doubt, ORS 161.055(1), one of two things. The state may show that—contrary to defendant's assertion—the tribal regulations, in fact, forbade what the defendant did. If

---

[5]Some courts say that the state regulation is invalid. It is more correct to say that the state may not apply its regulation to Indians exercising tribal rights. The regulation remains effective as to non-Indians and as to Indians who are not exercising a tribal right or who do not have tribal rights.

[6]In prosecuting an Indian who hunts or fishes in violation of a tribal regulation, the state is not enforcing the tribe's regulations. Rather, it is enforcing the state's laws. The only relevance of the tribal regulations is to remove the tribe's protection from the Indian's violation of state law.

the state does that, the Indian's status as an Indian becomes irrelevant, as does the existence of a conservation necessity. If the state does not make that showing, the court must presume that the Indian was acting under a tribal right. Under the circumstances here, in order to justify its prosecution, the state must show that a conservation necessity gave it the authority to override the tribe's rights.[7] That is essentially what we said in *State v. Gowdy, supra.* Despite the multitude of Indian fishing and hunting cases decided since then, *Gowdy* remains correct. Under it, there was sufficient evidence to justify defendant's conviction.

---

[7]The majority, consistently with some federal cases, discusses the issue in terms of whether the state has jurisdiction to try the defendant. This language confuses the issue. It is often difficult to decide whether the defendant acted consistently with a tribal right without first determining what the defendant did. That determination is peculiarly for the jury in a criminal case. Yet, if the determination decides the court's jurisdiction, how is the jury ever to have the question presented to it, and what verdict is it to render? The same point can be made concerning the existence of a conservation necessity. It is more appropriate to say that a defendant who assertedly acted under a treaty right is entitled to an acquittal unless the prosecution proves either a violation of tribal law or a conservation necessity.