STATE of Wisconsin, Plaintiff-Respondent,

v.

Thomas NEWAGO, Defendant-Appellant.†

STATE of Wisconsin, Plaintiff-Respondent,

v.

John H. PERO, Jr., Defendant-Appellant†

STATE of Wisconsin, Plaintiff-Respondent,

v.

John LEMIEUX, Defendant-Appellant.†

Court of Appeals

*No. 85–2185. Orally argued October 7, 1986.—Decided October 28, 1986.*
(Also reported in 397 N.W.2d 107.)

† Petition to review denied.

For the defendants-appellants, Thomas Newago, John H. Pero, Jr., and John Lemieux, there were briefs and oral argument by *John M. Wiley* of *Wisconsin Judicare, Inc.*, and *Candy L. Jackson, co-counsel Bad River Tribal Attorney*, and *Howard J. Bichler* of Rice Lake, Wisconsin.

For the plaintiff-respondent, State of Wisconsin, there was a brief and oral argument by *Bronson C. La Follette*, attorney general, and *Jody S. Melms*, assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.   Thomas Newago, John Pero, Jr., and John Lemieux (Newago), members of the Bad River Band of the Lake Superior Chippewas, appeal convictions for netting lake trout in a restricted area of Lake Superior. Newago claims that the trial court erred by finding the state Department of Natural Resources (DNR) regulation reasonable and necessary to preserve Lake Superior's lake trout population. He also argues that the regulation discriminated against the Bad River Band, and that federal and tribal regulation of Chippewa fishing preempted state regulation. Because we conclude that the trial court properly found the regulation reasonable, necessary, and nondiscriminatory, and that appropriate state regulation of Chippewa fishing in Wisconsin waters of Lake Superior is not preempted, we affirm the trial court's judgment.

Neither party disputes the facts leading to the DNR citations. The tribal members admitted using commercial fishing gear in the Sand Cut Reef area of Lake

Superior, an area forbidden by a DNR regulation to all commercial fishing. Wis. Admin. Code sec. NR 25.09(1)(b)(3) (1984). Instead, the controversy lies in the state's attempt to regulate fishing rights granted the Chippewas by an 1854 treaty with the federal government. Treaty with the Chippewas, Act Sept. 30, 1854, 10 Stat. 1109.

Although this treaty made no specific reference to fishing rights, the Wisconsin Supreme Court found that the treaty's reservation of certain lands "for the use of" the Chippewas implicitly included their right to continue fishing in Lake Superior. *State v. Gurnoe*, 53 Wis.2d 390, 400, 409, 192 N.W.2d 892, 896, 901 (1972). However, the *Gurnoe* court found that this grant of fishing rights did not foreclose the state from exercising its police power over the Chippewas to preserve Lake Superior's fish supply. *Id.* at 410, 192 N.W.2d at 902.

Citing several United States Supreme Court cases involving state regulation of Indian fishing rights, the *Gurnoe* court held that the state must show its regulations were "reasonable and necessary to prevent a substantial depletion of the fish supply." *Id.* Without this showing, the DNR could not enforce its regulations against Chippewas claiming fishing rights under the 1854 treaty. *Id.*

## EVIDENTIARY BURDEN

Newago argues that the trial court should have required the state to prove the challenged regulation's reasonability and necessity by evidence that was clear, satisfactory, and convincing, rather than by a preponderance of the evidence. He first asserts that although a showing of reasonability and necessity is merely a pre-

requisite to prosecution for a conservation code violation, cases involving Indian fishing rights seldom involve factual disputes. As a result, Newago claims, a finding that the regulation applies to a tribal member is essentially a finding that the fisher violated each element of the regulation. Thus, he asserts that the higher evidentiary standard required by sec. 23.76, Stats., for proof of conservation code violations should likewise be required for proof of the regulation's reasonability and necessity.

In addition, Newago argues that because a finding of reasonability and necessity enables the state to regulate treaty-guaranteed rights, due process demands a higher evidentiary standard than a mere preponderance of evidence. This court addressed the same issue in *State v. Peterson*, 98 Wis.2d 487, 297 N.W.2d 52 (Ct. App. 1980). Neither of Newago's arguments persuade us to change our position.

In *Peterson*, we held that proof of a regulation's reasonability and necessity was an element of the court's subject matter jurisdiction. *Id.* at 495, 297 N.W.2d at 55. Regardless of whether parties stipulate to the facts in a fishing rights controversy, the elements of the court's jurisdiction and the elements of the offense remain legally distinct. Elements of the court's subject matter jurisdiction are properly proved by a preponderance of the evidence. *McNutt v. GMAC*, 298 U.S. 178, 189 (1936).

The function of the evidentiary standard is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979)

(Harlan, J., concurring) (citing *In re Winship*, 397 U.S. 358, 370 (1970)). The *Addington* Court recognized that some jurisdictions have applied an intermediate evidentiary standard, such as Wisconsin's "clear, satisfactory and convincing," to civil cases involving allegations of fraud or other "quasi-criminal" offenses. *Id.* at 424. Wisconsin's application of this standard for proof of quasi-criminal conservation code violations bears out this observation. Section 23.76, Stats.

Consistency in the law forbids us from dispensing evidentiary burdens merely on the basis of whether parties stipulate to the jurisdictional facts. Here, Newago encounters nothing more by a finding of reasonability and necessity than coming under the trial court's jurisdiction. This finding permits a prosecution under a regulation whose elements must, in turn, be proved by clear, satisfactory, and convincing evidence.

Moreover, Newago need not have risked prosecution under the regulation in order to test it. Administrative regulations may generally be challenged at hearings during the rulemaking process as well as after their enactment through an action for declaratory judgment. Sections 227.18, 227.24 and 227.40, Stats.

## THE REGULATION'S REASONABILITY AND NECESSITY

Wisconsin has adopted the "reasonable and necessary" standard enunciated by the United States Supreme Court in *Puyallup Tribe v. Department of Game*, 391 U.S. 392 (1968) *"Puyallup I"*. *Gurnoe*, 53 Wis.2d at 410 n.37, 192 N.W.2d at 902 n.37. "Reasonable" means that a specific conservation measure is

appropriate to its purpose, and "necessary" means that the measure must be essential to conservation. *United States v. Washington*, 384 F.Supp. 312, 342 (W.D. Wash. 1974).

Whether a DNR regulation is reasonable and necessary to prevent a substantial depletion of the fish supply presents a mixed question of fact and law. On one hand, the trial court must determine the effect of conservation measures on the lake trout population. Such findings are factual because they require the trial court to weigh conflicting expert testimony. *Estate of Smith*, 82 Wis.2d 667, 676, 264 N.W.2d 239, 243 (1978). Thus, unless clearly erroneous, we must defer to the trial court's factual findings on the effect of the DNR's regulation and various fishing pressures on the lake trout population. Section 805.17(2), Stats.

However, whether those facts have meaning as a particular legal concept, such as reasonability or necessity, presents a question of law. *Exxon*, 90 Wis.2d at 713, 281 N.W.2d at 101. We need not defer to the trial court's conclusions of law. *See Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis.2d 349, 358, 377 N.W.2d 593, 598 (1985).

## REASONABILITY

The challenged regulation is reasonable if it is appropriate to its purpose. *Washington*, 384 F.Supp. at 342. We conclude that the regulation meets this requirement. Newago argues that the main purpose behind the regulation was to allocate fishing grounds between sports and commercial fishers. He contends that allocation is an inappropriate reason to regulate treaty pro-

tected fishing rights. We agree that regulation of fishing rights must be primarily in the interest of conservation. *Puyallup I*, 391 U.S. at 398. However, the trial court's factual findings support the conclusion that the regulation is an appropriate means to conserve lake trout.

Although one expert suggested conflict between commercial and sports fishers as the primary reason for creating the restricted area, other testimony supported the trial court's findings. Experts testified, and the trial court found, that sport fishing had little effect on the Sand Cut Reef area's lake trout population; that it takes an average of four hours for a sports fisher to catch one lake trout; that a few months of commercial fishing allowed in the nearby Gull Island refuge area accompanied a 50% drop in lake trout population; and that because a large number of native spawning trout remain in the Sand Cut Reef area, even during nonspawning times, commercial fishing would cause a decline in the lake trout population there. Because the regulation banning commercial fishing in the Sand Cut Reef area of Lake Superior is appropriate to the purpose of preventing a substantial depletion of the fish supply, we conclude that it is reasonable.

## NECESSITY

██

Newago contends that the regulation is not necessary. For a regulation to be necessary, it must be essential to conservation. *Washington*, 384 F.Supp. at 342. We conclude that the regulation prohibiting commercial fishing in the Sand Cut restricted area is necessary to prevent a substantial depletion of the fish supply. Here, the trial court found that the lake trout had been

depleted almost to extinction in the '50s and '60s due in part to the introduction to the Great Lakes of the sea lamprey, a successful predator of lake trout. Furthermore, although the low population level of the '50s and '60s has improved somewhat, the total Lake Superior lake trout population remains depleted, is currently declining, and has not established a capacity to reproduce naturally. The trial court noted that stocked lake trout could not reproduce as successfully as native lake trout. Thus, the trial court found that the establishment of a naturally reproducing population of native lake trout is essential to the species' survival in Lake Superior.

The trial court further found that the Sand Cut Reef represented one of the most productive native trout spawning areas in the Wisconsin waters of Lake Superior. Furthermore, the trial court found that commercial fishing would have a detrimental effect on the Sand Cut Reef spawning area, as evidenced by a 50% decline in lake trout accompanying several months' commercial fishing in the nearby Gull Island refuge. The trial court also found relatively insignificant the effect of sport fishing on the Sand Cut Reef spawning population.

Because the record supports these factual findings, they are not clearly erroneous. Section 805.17(2), Stats. Moreover, because of the importance of the Sand Cut Reef area to the establishment of a native reproducing lake trout population, and the sensitivity of the area's native trout population to commercial fishing, we conclude that the regulation is necessary to prevent a substantial depletion of the fish supply.

Newago argues that because it effectively forbids Chippewa commercial fishers from the Sand Cut Reef area while it allows non-Indian sport fishers, the DNR regulation discriminates against the Chippewas. A state's regulation of tribal fishing rights must not discriminate against the tribe. *Puyallup I*, 391 U.S. at 398-99. We endorse Newago's underlying assumptions that the Chippewas are exclusively commercial fishers, and sport fishing is effectively preempted by non-Indians. However, we conclude that in light of the entire record, the regulation does not discriminate against the Chippewas.

The state suggests, however, that the regulation does not discriminate because the Red Cliff Band has successfully filled its lake trout quota despite a ban on commercial fishing in the Sand Cut Reef restricted area. We emphatically reject this reasoning. To suggest that a restriction on Chippewa fishing is permissible merely because tribal members may fill their quota elsewhere in Lake Superior smacks of "separate but equal" treatment. We will strike any regulation of treaty-guaranteed fishing rights that segregates commercial and sport fishers mainly for economic or social purposes. This regulation, however, is not an arbitrary attempt to segregate commercial and sport fishers.

Newago bases his challenge to the regulation on *Department of Game v. Puyallup Tribe*, 414 U.S. 44 (1973) *"Puyallup II"*. In *Puyallup II*, the Supreme Court held that a state fishing regulation banning net fishing for steelhead trout on Washington's Puyallup River illegally discriminated against the tribe. *Id.* at 48. As an

anadromous fish, the steelhead trout hatches in fresh water, swims to the ocean where it matures, then returns through freshwater rivers and streams to its birthplace to spawn. Thus, each year a steelhead "run" swims up the Puyallup River to spawn. Expert testimony showed that a certain number of the steelhead run needed to escape capture in order to maintain a naturally reproducing population. After enactment of the state regulation, the entire maximum allowable catch went to sport fishers. The *Puyallup II* Court held that because it allowed the entire catch to go to non-Indian sport fishers at the expense of Indian commercial fishers, the regulation impermissibly discriminated against the tribe.

The *Puyallup II* Court further held that a proper regulatory scheme should apportion the maximum allowable catch between the Indian commercial fishers and the non-Indian sport fishers. *Id.* at 48. In so holding, however, the Court noted that the treaty "does not give the Indians a federal right to pursue the last living steelhead until it enters their nets." *Id.* at 49. If necessary to preserve the species, commercial fishing may be banned along with sport fishing. *Id.*

The case before us, however, differs in several respects from *Puyallup II*. First, the fishing area under consideration is a tiny area within Lake Superior, not an entire river as in *Puyallup II*. Second, rather than taking the entire allowable catch, sport fishers have an insignificant impact on the Sand Cut Reef spawning population. In fact, the total sport take from the Sand Cut Reef area has not been shown to exceed 10,000

pounds[1] as compared to the 1984 quota of 100,000 pounds for Indian commercial fishers.

■

Because the total sport take from the restricted area is essentially de minimis, especially when viewed in light of the efficiency of modern commercial fishing methods, we conclude that it would simply not be feasible to apportion that amount of fish between commercial and sport fishers. If the Sand Cut Reef could support a larger take, and if the quantity of fish taken from the area were significantly larger, we would consider apportionment as an appropriate remedy to avoid discrimination. However, we see no discrimination in failing to apportion a relatively insignificant amount of fish between sport and commercial fishers.

## PREEMPTION

Finally, Newago contends that a combination of Chippewa self-regulation and inherent tribal sovereignty preempts the state from regulating tribal fishing. We disagree. Notions of inherent tribal sovereignty no longer dominate preemption analysis. *McClanahan v. State Tax Commission*, 411 U.S. 164, 172 (1973). Instead, a tribe's tradition of sovereignty and self-gov-

---

[1] Indeed, the amount may have been less. Newago's brief included evidentiary exhibits showing that sport fishers caught 6,875 lake trout in 1984 in the Bayfield area of Lake Superior. According to other exhibits, the average lake trout, when caught, weighed between two and three pounds. However, Newago conceded at oral argument that the Bayfield area of Lake Superior comprises many more square miles than the Sand Cut Reef area. Thus, an exact weight for the sport take in the Sand Cut Reef restricted area may well have been less than 10,000 pounds in 1984.

ernance serves as a "backdrop" merely to inform a preemption analysis based mainly on federal statutes and applicable treaties. *Id.*

The United States Supreme Court applied its framework for preemption analysis in *Rice v. Rehner*, 463 U.S. 713, 720–25 (1983). The *Rice* preemption analysis involves two stages. First, the court must determine the nature of the "backdrop" of tribal sovereignty that will inform its weighing of competing state, tribal, and federal interests. *Rice*, 463 U.S. at 720. The extent of a tribe's tradition of sovereign immunity will add weight to tribal interests in this balancing. *Id.* at 719. State interests, in turn, are strengthened if the state can show off-reservation effects that compel state intervention in a given activity. *Id.* at 724 (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 336 (1983)).

At the second stage of the analysis, the Court must determine whether any federal law preempts state regulatory authority. *Rice*, 463 U.S. at 725. In *Rice*, a federally licensed Indian trader claimed that tribal sovereignty and federal law preempted California from requiring a license for takeout liquor sales at a reservation store. In balancing state, federal, and tribal interests, the *Rice* Court afforded little weight to the backdrop of tribal sovereignty. *Id.* The Court found that the power to regulate alcohol consumption and distribution on Indian reservations had traditionally resided in the federal government. *Id.* at 722. Moreover, the *Rice* Court found that the state's substantial interest in regulating off-reservation effects of liquor sales outweighed tribal interests in immunity from state regulation. *Id.* at 725.

Applying the second stage of the preemption analysis, the *Rice* Court found no federal preemption because the federal statute allowing tribal liquor regulation also allowed concurrent state regulation. *Id.* at 726. Here, the backdrop of tribal sovereignty and the lack of comprehensive federal regulation provide little to outweigh Wisconsin's interest in reasonably regulating tribal fishing on its Lake Superior waters.

An analysis of state power begins with the 1854 treaty. *See McClanahan*, 411 U.S. at 172. As noted above, the treaty is silent on particular fishing rights granted the Chippewas in Lake Superior. In construing the treaty to include the right to fish in Lake Superior, the Wisconsin Supreme Court noted that this right was not exclusive. *Gurnoe*, 53 Wis.2d at 410, 192 N.W.2d at 902. More important to this analysis, the right construed by the *Gurnoe* court was subject to reasonable regulation by the state. *Id.* Newago offers no authority to challenge the state's right to regulate tribal fishing so long as that regulation meets appropriate standards. Thus, the Bad River Band has never enjoyed sovereign immunity in its right to fish off-reservation in the Wisconsin waters of Lake Superior.

Further, the state has a substantial interest in the off-reservation effects of Chippewa commercial fishing. The fact that the fishing is off-reservation further weakens Newago's claim of tribal sovereignty. Moreover, because these fishing rights are shared with all other state citizens, Wisconsin's regulatory interest is substantial. *See Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979). Granting immunity from reasonable regulation to Chippewa commercial fishers would undercut the

state's ability to conserve for all its citizens the living resources in its Lake Superior waters.

Newago also claims that comprehensive tribal commercial fishing regulations prevent the state from exercising its right to regulate tribal members. State laws may be applied, even on reservations, unless such regulation would interfere with reservation self-government or would impair a right granted or reserved by federal law. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973). Here, the challenged state regulation does not preclude the Chippewas from imposing their own comprehensive system of regulation on tribal members. Neither does the state's regulation impair a right granted or reserved by federal law. Thus, we must reject Newago's claim to tribal preemption of state regulation.

Finally, applying the second branch of the *Rice* test, we note that Newago has failed to cite any federal law that would preempt state regulation. Therefore, we must reject Newago's entire preemption argument. We find that neither federal law nor the tribe's regulation of its own members preempts the reasonable, necessary, and nondiscriminatory state regulation affecting fishing rights granted by the 1854 treaty.

*By the Court.*—Judgment affirmed.

LaROCQUE, J. (*dissenting*) I believe *State v. Peterson*, 98 Wis.2d 487, 495, 297 N.W.2d 52, 55 (Ct. App. 1980), to be in error in its conclusion that the trial court has jurisdiction if proven only by a preponderance of the evidence. The "reasonableness and necessity" of a regulation against Indian fishers is an element of the court's subject matter jurisdiction. *Id.* The test for burden of proof, simply stated, is to weigh the value society places on the right in controversy, and the greater the

value, the greater the burden. *See Addington v. Texas,* 441 U.S. 418 (1979). The right in controversy here is the Indians' right to be free of discrimination as an element of reasonableness of the regulation. The burden is on the state in the first place because the Chippewas ceded their Wisconsin lands to the United States government in exchange for these fishing rights. *See State v. Gurnoe,* 53 Wis.2d 390, 396, 192 N.W.2d 892, 894–95 (1972).

Neither the case relied upon in *Peterson* nor the one cited by the majority here supporting a lesser burden concerns an interest of comparable magnitude. Both *Afram v. Balfour, Maclaine, Inc.,* 63 Wis.2d 702, 218 N.W.2d 288 (1974), relied upon in *Peterson,* and *McNutt v. GMAC,* 298 U.S. 178 (1936), relied upon here, involved, ultimately, only the proper choice of forum. In *Afram,* the issue was whether Wisconsin had personal jurisdiction under its "longarm" statute. Regardless of an adverse decision, the plaintiff could enforce his rights in another jurisdiction. In *McNutt,* the issue was whether GMAC had properly pleaded that the matter in controversy exceeded the sum of $3,000 so as to give the federal court jurisdiction. The only right in controversy was whether GMAC could sue in a federal court rather than a state court.

I would reverse and remand to the trial court for the purpose of determining the reasonableness and necessity of the DNR regulation, and thus absence of discrimination, under a clear, satisfactory, and convincing burden of proof.