Argued and submitted May 11, reversed September 8, petition for review
allowed December 29, 2022 (370 Or 694)
See later issue Oregon Reports

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RUSSELL BOYD McCORMACK,
*Defendant-Appellant.*

Wasco County Circuit Court
19CR36453; A173714 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN DELROY SENTER, JR.,
*Defendant-Appellant.*

Wasco County Circuit Court
19CR36463; A173715

517 P3d 1033

In this consolidated criminal case, defendants—who are both enrolled members of the Nez Perce Tribe—caught salmon at a "usual and accustomed" place pursuant to Article III of the Nez Perce Treaty of 1855, and they were convicted of unlawfully taking food fish, ORS 509.006, using gillnets prohibited under OAR 635-041-0025(3). On appeal, defendants argue that the trial court erred when it denied their pretrial motions to dismiss, because the state failed to prove that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, is necessary for the conservation of Columbia River salmon populations. *Held*: Under Article III of the Nez Perce Treaty of 1855, defendants had a reserved right to fish at "all usual and accustomed places" without restriction by the state, unless the state proved that such restriction, and its application to treaty fishers, was necessary for the conservation of fish. The evidence in the record was legally insufficient to support the trial court's conclusion that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, was necessary for the conservation of Columbia River salmon populations; therefore, the trial court erred in denying defendants' motion to dismiss.

Reversed.

Janet L. Stauffer, Judge.

John Evans, Deputy Public Defender, argued the cause and filed the briefs for appellants. Also on the briefs was

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

TOOKEY, P. J.

Reversed.

## TOOKEY, P. J.

Under Article III of the Nez Perce Treaty of 1855, members of the Nez Perce Tribe have a reserved right to fish at "all usual and accustomed places" without restriction by the state, unless the state proves that such restriction is necessary for the conservation of fish.

In this consolidated criminal case, defendants—who are both enrolled members of the Nez Perce Tribe—used gillnets to catch Chinook salmon at a "usual and accustomed" place along the southern bank of the Columbia River.[1] As a result of that conduct, defendants were convicted of unlawfully taking food fish with prohibited fishing gear, ORS 509.006; OAR 635-041-0025(3).[2] On appeal, defendants raise five assignments of error, arguing that the trial court erred when it denied defendants' pretrial motions to dismiss, because the evidence in the record is legally insufficient to support the trial court's conclusion that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, is necessary for the conservation of Columbia River salmon populations. For the reasons that follow, we reverse.

Whether the state has the authority to enforce its regulations against treaty fishers is a question of law. *State v. Jim*, 81 Or App 177, 184, 725 P2d 365 (1986), *rev den*, 302 Or 571 (1987). In determining "whether the trial court's findings of fact are sufficient to support the trial court's conclusion," we "review a trial court's legal determinations for legal error and the trial court's findings of fact for any evidence in the record to support those findings." *M. A. B. v.*

---

[1] An Oregon Department of Fish and Wildlife (ODFW) fisheries manager testified for the state that "[a] gill net is typically a single-walled *** curtain [with] mesh sizes [that] are generally big enough that they are *** an ensnaring gear" that, if "[f]ish encounter, they become ensnared in the mesh."

[2] ORS 509.006 provides, in relevant part, "It is unlawful to take *** any food fish in or from any waters of this state *** in a manner or by means of the fishing gear prohibited by law."

OAR chapter 635, division 41, provides rules applicable to "those individuals possessing Indian treaty fishing rights pursuant to *** the Nez Perce Treaty." OAR 635-041-0005(1). OAR 635-041-0025(3) provides, "It is unlawful to use gill nets, set nets, hoop nets, setlines, or dip nets or bag nets of a mesh size exceeding five inches, or any other type of fishing gear not otherwise specifically authorized in section (1) of this rule, except during the times and in the areas where such gear is authorized for commercial fishing."

*Buell*, 366 Or 553, 564, 466 P3d 949 (2020). In accordance with that standard, we recount the following facts.

## I.  BACKGROUND

A.  *The Instant Litigation*

Defendants are enrolled members of the Nez Perce Tribe.

On May 16, 2019, defendants were fishing with gill-nets along the southern bank of the Columbia River, near The Dalles Dam. That location is a "usual and accustomed" fishing site for treaty fishers and falls within "Zone 6" of the Columbia River.[3] At the time, the spring-run Chinook salmon were migrating up the Columbia River. Defendants were using gillnets that measured, respectively, 32 feet long by 11 feet deep, with an eight-inch mesh; and 42 1/2 feet long by 17 1/2 feet deep, with a seven-and-one-half inch mesh. Three Senior Troopers with the Oregon State Police Fish and Wildlife Division contacted defendants and cited them for using gillnets that did not comply with OAR 635-041-0025(3). The state then charged each defendant with one count of unlawfully taking a food fish under ORS 509.006, based on defendants' use of noncompliant gillnets.

In substantively identical pretrial motions to dismiss, defendants argued that, under federal law, the state could not enforce the gillnet restriction in OAR 635-041-0025(3) against defendants, because the state could not prove that that restriction, and its application to treaty fishers, was necessary for the conservation of Columbia River fish populations. The state responded that OAR 635-041-0025(3), and its application to treaty fishers, was necessary for conservation, and that it would offer testimony to that effect from an Oregon Department of Fish and Wildlife (ODFW) fisheries manager.

At a hearing on defendants' pretrial motions, the ODFW fisheries manager testified that, although gillnets are

---

[3] The state stipulated below that "the incident location was at a usual and accustomed place on the Columbia River" in Zone 6. Zone 6 is a 147-mile stretch of the Columbia River between Bonneville Dam (to the west) and McNary Dam (to the east). Zones 1 to 5 cover a 145-mile stretch of the river between Astoria (to the west) and Bonneville Dam (to the east).

allowed for commercial fishing at certain times and places in other zones of the Columbia River, gillnets are not allowed for treaty subsistence fishing in Zone 6.[4] He explained that, in the area where defendants were fishing in Zone 6 near the dam, fish "congregate as they are looking for the fish ladders to ascend the ladders and continue migrating" and "can be present in greater concentrations [near the ladders] than they might be in the rest of the river." The ODFW fisheries manager testified that the gillnet regulation in OAR 635-041-0025(3) was necessary for conservation, because there are 13 fish species in the Columbia that are listed as either "threatened" or "endangered" under the federal Endangered Species Act, including spring-run Chinook; that "[g]ill nets have the capacity to catch a tremendous amount of fish in a short amount of time"; and that, "even if just by accident [a gillnet] was left too long or unattended or just an unlucky swarm of fish came through in a very short amount of time, you could catch a high amount of fish and there is the potential that those would be endangered or listed." He explained that, for him, the "specific concern" was that use of gillnets at the location where defendants were fishing near the dam had the "potential capacity to impact those endangered stocks in a short amount of time."

The ODFW fisheries manager further testified that the treaty tribes are allotted a certain quantity of fish that they may harvest pursuant to a joint management agreement with the state—*i.e.*, the 2018-2027 *United States v. Oregon* Management Agreement (Management Agreement);[5]

---

[4] OAR 635-041-0010(5) provides, "'Subsistence fishing' means taking fish for Indians' personal use, including the sale or exchange with other treaty Indians, but not sale or trade with non-Indians."

[5] The ODFW fisheries manager referred to the 2018-2027 *United States v. Oregon* Management Agreement, which the state attached as an exhibit to an affidavit it filed in the trial court. The Management Agreement is the latest of several, similar, prior joint-management agreements regarding fish harvests in the Columbia River. *See* Michael C. Blumm & Cari Baermann, *The Belloni Decision and Its Legacy:* United States v. Oregon *and Its Far-Reaching Effects After a Half-Century*, 50 Envtl L 347, 372-80 (2020) (explaining history and evolution of Columbia River fisheries co-management plans between 1969 and 2020). The signatories to the Management Agreement include the tribes of the Nez Perce, Umatilla, Warm Springs, Yakama, and Shoshone-Bannock; the states of Washington, Idaho, and Oregon; and NOAA Fisheries, the U.S. Fish and Wildlife Service, and the Bureau of Indian Affairs. We discuss the Management Agreement in greater detail, below. *See* 321 Or App at 557-59.

that he did not believe the tribes had exceeded the catch amounts for any threatened or endangered fish species during the 2019 spring run; and that he was not aware of any instance where treaty fishing had impeded the recovery of any fish population in the Columbia River.

During his testimony, the ODFW fisheries manager also stated that the "greatest manmade impact" on Columbia River fish populations comes from the river's system of dams: "The dams impede migration in both directions and cause [a] tremendous amount of both immediate and latent mortality for the out-migrating" fish. He also identified other human activities that negatively impact Columbia River fish populations, including "[l]ogging, stream use, [and] agriculture."

Based primarily on the ODFW fisheries manager's testimony, the trial court found, by preponderance of the evidence, that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, was necessary for conservation. In so ruling, the trial court emphasized that the evidence showed a need to prohibit gillnets at the location where defendants had been fishing near the dam, because the fish "congregate in high numbers" there, and gillnets would allow fishers to catch "high numbers" of fish. The court specifically found that the regulation at issue was "required to prevent a demonstrable harm to actual conservation" and was "essential" to perpetuating "the spring runs of the salmon." The trial court then held a stipulated-facts bench trial, and defendants were both found guilty of unlawfully taking food fish with prohibited fishing gear, ORS 509.006; OAR 635-041-0025(3).

On appeal, defendants contend that the state did not satisfy its burden of proving that OAR 635-041-0025(3), and its application to treaty fishers, was necessary for conservation, because, among other reasons, the state presented no evidence that the Nez Perce Tribe's own conservation measures were insufficient for conservation of the salmon or that the state's conservation goal served by the gillnet restriction could not be accomplished by further regulating nontreaty fishers.

The state responds that, based on the ODFW fisheries manager's testimony, the state met its burden by showing that gillnets are capable of catching large numbers of threatened or endangered fish in a short amount of time, particularly where defendants were fishing near The Dalles Dam, and that OAR 635-041-0025(3) imposes "limited restrictions on location and gear," which are "consistent with" the Management Agreement. For those reasons, the state contends, the evidence was legally sufficient to support the trial court's determination that OAR 635-041-0025(3), and its application to treaty fishers, is necessary for the conservation of salmon.[6]

B.   United States v. Oregon *and the 2018-2027 Management Agreement*

Before turning to the legal issue in the instant case, we discuss the decades-long litigation of treaty-reserved fishing rights in *United States v. Oregon* and the 2018-2027 *United States v. Oregon* Management Agreement, because the parties refer to it throughout their briefing, and because it has factored prominently in both the state's efforts to conserve fish populations and the tribes' efforts to uphold their treaty-reserved right to fish.

In September 1968, the United States—on behalf of itself and various tribes, including the Nez Perce Tribe—filed a complaint in *United States v. Oregon*, 302 F Supp 899 (D Or 1969),[7] challenging certain Oregon statutes

---

[6] On appeal, both parties assert—and we agree—that, as in *State v. Jim*, we need not decide whether the argument raised below in defendants' motions to dismiss presented an issue of subject-matter jurisdiction, personal jurisdiction, or simply a treaty defense to prosecution, as doing so would not affect the dispositive legal question before our court—*i.e.*, whether the evidence was legally sufficient to support the trial court's determination that OAR 635-041-0025(3), and its application to treaty fishers, is necessary for conservation. *See State v. Jim*, 81 Or App 189, 191 n 2, 725 P2d 372 (1986) ("Defendant raises the same issue in two ways. First, he challenges the state's jurisdiction. Second, he raises a treaty defense. The analysis in both cases is the same.").

[7] Due to the overlapping treaty-rights issues raised in two separate federal court cases—*Sohappy v. Smith* and *United States v. Oregon*—the district court ordered both cases "consolidated for pretrial procedures and for trial." *See* 302 F Supp at 904. Consequently, *Sohappy* represents the first case in the ongoing litigation referred to as *United States v. Oregon*. *See, e.g.*, *United States v. Oregon*, 657 F2d 1009, 1011 (9th Cir 1981) (noting that "[t]he United States initiated this action in 1968," and citing *Sohappy v. Smith*, 302 F Supp 899 (D Or 1969)).

and regulations that, the plaintiffs argued, violated their treaty right to fish at "usual and accustomed places" on the Columbia River. 302 F Supp at 903-04. The court determined that the treaties entitled the tribes to "a fair share of the fish produced by the Columbia River system," and that any state regulation must be "necessary for conservation." *Id.* at 911. The court then retained jurisdiction over the case in anticipation of similar, future disputes, explaining:

> "This court cannot prescribe in advance all of the details of appropriate and permissible regulation of the Indian fishery * * *. As the Government itself acknowledges, proper anadromous fishery management in a changing environment is not susceptible of rigid pre-determination [and] the variables that must be weighed in each given instance make judicial review of state action, through retention of continuing jurisdiction, more appropriate than overly-detailed judicial predetermination."

*Id.* (internal quotation marks omitted).[8]

The court's decision to retain jurisdiction soon proved essential; throughout the early 1970s, "litigation continued," state management of the fish runs "often occurred on a run-by-run basis," and the tribes repeatedly "ask[ed] the court for emergency injunctions." Michael C. Blumm & Cari Baermann, *The Belloni Decision and Its Legacy:* United States v. Oregon *and Its Far-Reaching Effects After a Half-Century*, 50 Envtl L 347, 373 (2020). Therefore, in 1975, the court "ordered the tribes and states to cooperate on developing a comprehensive fish management plan." *Id.* at 374. In 1977, "the tribes and states finally adopted a five-year co-management plan"; however, the "1977 plan expired in 1982," and the "next year, the parties were back in court, litigating the same conservation issues over which the parties struggled since * * * 1969." *Id.* at 374-75. From 1983 to 1988, the "tribes and the states continued to negotiate," and, in 1988, "the tribes and states agreed to a new ten-year Columbia River Fish Management Plan (1988 plan)."

---

[8] The term "Indian"—rather than another term—appears throughout this opinion, because that is the term used in the relevant case law, federal legislation, and scholarly literature, *see State v. Begay*, 312 Or App 647, 652 n 3, 495 P3d 732 (2021) (taking similar approach), and it is the term used by the parties in their briefing.

*Id.* at 376. The 1988 plan "included not only harvest limits but also established specific goals, timetables, and methods for cooperative management of both natural and hatchery fish for Columbia River Basin fish runs in Idaho, Oregon, and Washington." *Id.* (internal quotation marks omitted).

Thereafter, the parties negotiated several subsequent agreements, and, in 2018, the parties negotiated the 2018-2027 *United States v. Oregon* Management Agreement. The signatories of the Management Agreement include the Nez Perce, Umatilla, Warm Springs, and Yakama tribes—collectively referred to as the "Columbia River Treaty Tribes"; the states of Washington, Idaho, and Oregon; and NOAA Fisheries, the U.S. Fish and Wildlife Service, and the Bureau of Indian Affairs. As noted above, the purpose of the Management Agreement is "to provide a framework within which the Parties may exercise their sovereign powers in a coordinated and systematic manner to protect, rebuild, and enhance upper Columbia River fish runs while providing harvests for both treaty Indian and non-treaty fisheries." *United States v. Oregon* Management Agreement (2018-2027), Civ No 3:68-cv-00513-MO (D Or Feb 26, 2018), ECF 2607-1. The Management Agreement provides, among other things, the allotment of fish that the Columbia River Treaty Tribes have a legal right to harvest. It also provides that "[t]he Columbia River Treaty Tribes maintain that tribal fisheries are subject to limitations only under the conservation necessity standards in federal case law, including case law governing the *United States v. Oregon* litigation. Other Parties, including the States, disagree."

## II.   ANALYSIS

We begin our analysis by discussing the Nez Perce Tribe's treaty right to fish at "usual and accustomed" places. We then discuss the "conservation necessity" standard—the standard developed by the federal courts that governs the permissibility of state restrictions on treaty fishing rights. Finally, we apply that standard to the instant case, concluding that the trial court erred when it denied defendants' pretrial motion to dismiss, because we believe the evidence in the record is legally insufficient to support the trial court's conclusion that the gillnet regulation in OAR

635-041-0025(3), and its application to treaty fishers, is necessary for the conservation of Columbia River salmon populations.

A.  *The Nez Perce Tribe's Treaty Right to Fish at Usual and Accustomed Places*

Scholars have pointed out that, "[p]rior to white settlement, numerous tribes established temporary and permanent fishing camps along the Columbia River." Blumm & Baermann, 50 Envtl L at 349 n 4 (2020). By "the early 1850s, the Nez Perce still lived in their vast aboriginal domain," which "encompassed most of Central Idaho *** as well as parts of southeast Washington and northeast Oregon," and they "travel[ed] to traditional fishing spots as far west as the fabulous grounds at Celilo Falls on the Columbia." Charles F. Wilkinson, *Indian Tribal Rights and the National Forests: The Case of the Aboriginal Lands of the Nez Perce Tribe*, 34 Idaho L Rev 435, 436 (1998). In 1854 and 1855, during a "burst of treaty-making activity," the United States negotiated numerous treaties with the Indians of Oregon and the Puget Sound region. Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 1.03(6)(b), 63-64 (Nell Jessup Newton ed 2012). One of those treaties was the Nez Perce Treaty of 1855. 12 Stat 957 (ratified Mar 8, 1859).

As relevant here, Article III of the Nez Perce Treaty of 1855 guarantees to the Nez Perce "the right of taking fish at all usual and accustomed places in common with citizens of the Territory." *Id.* It is "well established that every fishing location where members of a tribe customarily fished from time to time at and before treaty times *** is a usual and accustomed ground or station at which the treaty tribe reserved, and its members presently have, the right to take fish." *United States v. Confederated Tribes of Colville Indian Reservation*, 606 F3d 698, 711 (9th Cir 2010).

Importantly, we highlight that the "treaty was not a grant of rights *to* the Indians, but a grant of right *from* them—a reservation of those not granted." *United States v. Winans*, 198 US 371, 381, 25 S Ct 662, 49 L Ed 1089 (1905) (emphases added). The fishing rights guaranteed under the

Nez Perce Treaty of 1855 are "part of the supreme law of the land which the states and their officials are bound to observe." *Sohappy v. Smith*, 302 F Supp 899, 905 (D Or 1969). Accordingly, "[t]he right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State." *Puyallup Tribe v. Dep't of Game* (*Puyallup I*), 391 US 392, 398, 88 S Ct 1725, 20 L Ed 2d 689 (1968); *see also Antoine v. Washington*, 420 US 194, 205, 95 S Ct 944, 43 L Ed 2d 129 (1975) ("State qualification of the [tribe's treaty-reserved fishing] rights is * * * precluded by force of the Supremacy Clause.").

B.  *The Conservation Necessity Standard*

As a general rule, "state regulation of Indian hunting and fishing must yield to Indian rights secured by [the Nez Perce] treaty," *State v. Jim*, 81 Or App 189, 192, 725 P2d 372 (1986), but the United State Supreme Court has held that "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation," *Puyallup I*, 391 US at 398. However, "no regulation applied to off-reservation treaty [fishing] can be valid or enforceable unless and until it has been shown reasonable and necessary to conservation as defined by federal law." *Jim*, 81 Or App at 194 (brackets and internal quotation marks omitted); *see also United States v. Sohappy*, 770 F2d 816, 823 (9th Cir 1985), *cert den*, 477 US 906 (1986) ("[A] State prosecuting an Indian treaty fisherman for violating a state fishing regulation must establish that the regulation is reasonable and necessary for conservation purposes.").

Under federal law, "[c]onservation purposes are narrowly circumscribed, encompassing only those that are necessary for the perpetuation of a species," or "necessary to prevent the exercise of the [fishing] right in a manner that will imperil the continued existence of the resource." *Jim*, 81 Or App at 193 (citing *Dep't of Game v. Puyallup Tribe* (*Puyallup II*), 414 US 44, 46-48, 94 S Ct 330, 38 L Ed 2d 254 (1973), and *Sohappy*, 302 F Supp at 908 (brackets, ellipsis, and internal quotation marks omitted)). Thus, the "'conservation necessity' standard accommodates both the State's interest in management of its natural resources and the [Tribe's] federally guaranteed treaty rights." *Minnesota v.*

*Mille Lacs Band of Chippewa Indians*, 526 US 172, 205, 119 S Ct 1187, 143 L Ed 2d 270 (1999).

To satisfy the conservation necessity standard—and, therefore, to enforce the regulation against treaty fishers at usual and accustomed sites—the state must prove three requirements: "(1) [T]he regulation is a reasonable and necessary conservation measure; (2) the application of the specific regulation to treaty fishers is necessary in the interest of conservation, and (3) the regulation does not discriminate against treaty fishers." *Jim*, 81 Or App at 181. We focus in particular on the first and second prongs, as they are dispositive in this case.

Regarding the first prong, to show that its regulation is a reasonable and necessary conservation measure, "the state must show that *** the regulation [is] the least restrictive which can be imposed consistent with" achieving the state's conservation goal, *United States v. Oregon*, 769 F2d 1410, 1416 (9th Cir 1985), and the "state must demonstrate that the tribe's own conservation measures are insufficient to meet the needs of conservation," *Shoshone Bannock Tribes v. Fish & Game Comm'n*, 42 F3d 1278, 1283 (9th Cir 1994) (citing *United States v. Washington*, 520 F2d 676, 686 (9th Cir 1975), *cert den*, 423 US 1086 (1976) ("So long as the tribes responsibly insure that the run of each species in each stream is preserved, the legitimate conservation interests of the state are not infringed.")). Regarding the second prong, to show that applying the specific regulation to treaty fishers is necessary in the interest of conservation, "[t]he state must show *** that restriction of *** non-treaty [fishers] is insufficient to accomplish conservation of the resource." *Jim*, 81 Or App at 195; *see also Washington*, 520 F2d at 686 ("The state must pursue its goals as best it can by regulating its own non-treaty-Indian citizens," and "[d]irect regulation of treaty Indian fishing in the interests of conservation is permissible only after the state has proved unable to preserve a run by forbidding the catching of fish by other citizens under its ordinary police power jurisdiction." (Citing *Antoine*, 420 US at 207-08.)).

Under the conservation necessity standard, the state bears the burden of proof. *Jim*, 81 Or App at 194; *see also Antoine*, 420 US at 207 ("[T]he State must demonstrate

that its regulation is a reasonable and necessary conservation measure."). Though it is well established that that burden falls upon the state, it is less well established what degree of proof is required to satisfy that burden.[9] The appellate courts of this state have not previously addressed that point, and the scant case law from other jurisdictions that have addressed that point shows that not every court has required the same degree of proof. At least one jurisdiction has required a "preponderance of the evidence." *See State v. Peterson*, 98 Wis 2d 487, 495, 297 NW2d 52, 55 (Wis Ct App 1980) ("[T]he reasonableness and necessity of the enforcement of a regulation against Indian fishermen *** must be supported by a preponderance of the evidence."); *but see State v. Newago*, 134 Wis 2d 420, 434-35, 397 NW2d 107, 114 (Wis Ct App 1986) (LaRocque, J., dissenting) ("I believe *State v. Peterson*, [98 Wis 2d 487], to be in error in its conclusion that the [conservation necessity standard must be] proven only by a preponderance of the evidence. *** I would reverse and remand to the trial court for the purpose of determining the reasonableness and necessity of the DNR regulation *** under a clear, satisfactory, and convincing burden of proof."). In other jurisdictions, however, courts have required "clear and convincing evidence." *See United States v. State of Mich.*, 653 F2d 277, 279 (6th Cir), *cert den*, 454 US 1124 (1981) ("The state bears the burden of persuasion to show by clear and convincing evidence that *** the need for [its gillnet fishing] regulation exists."); *see also State v. Reed*, 92 Wash 2d 271, 276, 595 P2d 916, *cert den*, 444 US 930 (1979) (noting that "the state need only introduce clear and convincing evidence to show that the regulation was reasonable and necessary for conservation" (citing *United States v. Washington*, 384 F Supp 312, 342 (WD Wash 1974))). In light of the available authority, and because this case involves Indian treaty rights—a matter of federal law—we follow the United States Court of Appeals for the Sixth Circuit and the Washington State Supreme

---

[9] As one scholarly article observes, the United States Supreme Court is "all over the map in determining the standard of proof for the various sovereignty-protected doctrines," and, in the context of the conservation necessity standard, "there is little guidance as to what kind of showing is demanded." Note, *The Sovereign Self-Preservation Doctrine in Environmental Law*, 133 Harv L Rev 621, 633-34 (2019).

Court, and we conclude that the conservation necessity standard requires the state to prove by clear and convincing evidence that its regulation of treaty fishing is necessary for conservation.[10]

---

[10] There are, we think, two additional reasons in support of requiring the state to meet its burden under the conservation necessity standard by clear and convincing evidence. First, we are mindful that "Indian treaties, like international treaties, entered into by the United States are part of the supreme law of the land which the states and their officials are bound to observe." *Sohappy*, 302 F Supp at 905; *see also Missouri v. Holland*, 252 US 416, 432, 40 S Ct 382, 64 L Ed 641 (1920) ("[Under] Article 6, treaties made under the authority of the United States, along with the Constitution and laws of the United States made in pursuance thereof, are declared the supreme law of the land."). For that reason, "[s]tate regulation of tribal rights normally is preempted by federal law," and courts have made it clear that "a state may regulate off-reservation [treaty] rights only so long as the regulation is 'reasonable and necessary'" for conservation. *Restatement of the Law of American Indians* (Proposed Final Draft) § 83(e) (Mar 30, 2021); *see also Sohappy*, 302 F Supp at 908 (holding that state may regulate tribe's treaty-reserved fishing rights "only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource"). Thus, we think that requiring the higher clear and convincing standard, rather than the lower preponderance standard, is more consistent with the limitations on state regulatory power enshrined in the conservation necessity standard and with the status of Indian treaty-fishing rights under the Supremacy Clause. *See OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F3d 1008, 1020 (9th Cir 2018) ("Clear and convincing evidence requires greater proof than preponderance of the evidence.").

Second, when a federal law (rather than state law) has the effect of restricting an Indian treaty right, federal courts have required "clear evidence" or "clear and convincing evidence" that Congress intended to abrogate that treaty right. *See, e.g.*, *Herrera v. Wyoming*, 587 US ___, 139 S Ct 1686, 1698-99, 203 L Ed 2d 846 (2019) ("There simply is no evidence that Congress intended to abrogate the 1868 Treaty right through the Wyoming Statehood Act, much less the 'clear evidence' this Court's precedent requires."); *Mille Lacs Band of Chippewa Indians*, 526 US at 202-03 ("Congress may abrogate Indian treaty rights, but *** [t]here must be clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." (Internal quotation marks omitted.)); *United States v. Turtle*, 365 F Supp 3d 1242, 1248 (MD Fla 2019) ("[T]he Court does not find clear and convincing evidence that Congress chose to abrogate the Tribe's" treaty-secured fishing and hunting rights.); *United States v. Fiddler*, No 2:10-cr-00052-RLH-LRL, 2011 WL 2149510 at *2 (D Nev Mar 11, 2011) ("In assessing whether Congress implicitly abrogated a treaty right, what is essential is clear and convincing evidence that Congress" chose to abrogate the Indian treaty.); *United States v. Imperial Irrigation Dist.*, 799 F Supp 1052, 1063 (SD Cal 1992) ("[T]he relevant inquiry is whether *** clear and convincing evidence [shows] that Congress knew that the lands were Indian lands and intended to abrogate the band's rights to the land."). To the extent that an analogy may be drawn between a federal law restricting treaty-reserved rights and a state law doing the same, we think that using the clear and convincing standard in the former context seems to support, and be consistent with, using that same standard in the latter context.

With that understanding of the conservation necessity standard in mind, we turn to its application in this case.

## C. *Application*

As explained above, to enforce the gillnet restriction in OAR 635-041-0025(3) against defendants, the state had the burden of proving by clear and convincing evidence that that restriction, and its application to treaty fishers, was necessary for conservation. Here, as relevant to our consideration of prongs one and two of the conservation necessity standard, the state presented testimony that gillnets are allowed for commercial fishing in other zones of the Columbia River but are not allowed for treaty subsistence fishing in Zone 6, where defendants were fishing; that there are 13 species of fish in the Columbia River that are threatened or endangered; that fish congregate in higher concentrations near the dam where defendants were fishing; that gillnets are capable of catching large amounts of fish very quickly; and that gillnets "left too long or unattended" have the "potential capacity to impact those endangered stocks in a short amount of time." That evidence might be sufficient to show that enforcing OAR 635-041-0025(3) against treaty fishers could be *beneficial* to the state's salmon conservation goals; however, we conclude that the trial court erred when it denied defendants' pretrial motions to dismiss, because the evidence in the record is legally insufficient to support the trial court's conclusion that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, is *necessary* for the conservation of Columbia River salmon populations. *Cf. Jim*, 181 Or App at 195 ("[A] rational relation to conservation * * * is not enough to authorize the state to enforce its regulation" against treaty fishers.).

As we said above, under the first prong of the conservation necessity standard, to show that OAR 635-041-0025(3) is necessary for conservation, "the state must demonstrate that the tribe's own conservation measures are insufficient to meet the needs of conservation." *Shoshone Bannock Tribes*, 42 F3d at 1283. Here, however, the state presented little, if any, evidence about the Nez Perce Tribe's own conservation measures, much less

evidence demonstrating clearly and convincingly that any such measures are insufficient to ensure the perpetuation of the fish in the Columbia River.[11] To the contrary, testimony from the ODFW fisheries manager showed that the tribes had not violated the catch amounts for any threatened or endangered fish species during the 2019 spring run, and that he was not aware of any instance where treaty fishers had impeded the recovery of any of the fish populations in the Columbia River. Thus, we do not think the state met its burden with respect to that point. *See Washington*, 520 F2d at 686 ("So long as the tribes responsibly insure that the run of each species in each stream is preserved, the legitimate conservation interests of the state are not infringed.").

Additionally, as we also said above, under the second requirement of the conservation necessity standard, "[d]irect regulation of treaty Indian fishing in the interests of conservation is permissible only after the state has proved unable to preserve a run by forbidding the catching of fish by other citizens under its ordinary police power jurisdiction," *Washington*, 520 F2d at 686, and "[t]he state must show *** that restriction of *** non-treaty [fishers] is insufficient to accomplish conservation of the resource," *Jim*, 81 Or App at 195. Here, the state's witness explained that gillnets are not allowed for treaty subsistence fishing in Zone 6 of the Columbia River, but gillnets are allowed for non-treaty commercial fishing in other zones of the river. However, nothing in the record shows that the state was unable to preserve the spring-run Chinook by forbidding the catching of fish by other individuals under its ordinary police power and, therefore, had to adopt this particular gillnet regulation. Similarly, the state did not show that further restriction of non-treaty fishers would be insufficient to accomplish conservation of the Columbia River fish populations. The state did not show, for example, that restricting or forbidding non-treaty fishing in Zones 1 to 5—where gillnet fishing by non-treaty fishers is allowed at certain times and places for commercial purposes—would be insufficient

---

[11] During the hearing on defendants' pretrial motion, the state observed that the Nez Perce regulations define "gill net" but do not "say one way or another where it can be used."

to accomplish conservation of the Columbia River salmon populations.

For the above reasons, we conclude that the evidence in the record is legally insufficient to support the trial court's conclusion that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, is necessary for the conservation of Columbia River salmon populations; therefore, the trial court erred in denying defendants' motion to dismiss.

In seeking a contrary conclusion, the state also contends that the harvest allotments provided in the Management Agreement are necessary for conservation, and that OAR 635-041-0025(3) imposes "limited restrictions on location and gear," which are "consistent with" the Management Agreement. As we understand that contention, the state suggests that the gillnet restriction in OAR 635-041-0025(3) being "consistent with" the Management Agreement indicates that that restriction is necessary for conservation. We disagree.

As noted above, the test for determining the permissibility of a state restriction on treaty-reserved fishing rights is whether that restriction is necessary for conservation (*i.e.*, necessary for the perpetuation of a species), not whether it is "consistent with" a co-management agreement. To be sure, the ODFW fisheries manager testified that the treaty tribes are allotted a certain quantity of fish that they may harvest under the Management Agreement, and the Management Agreement does provide that "[t]ribal harvest in mainstem treaty fisheries with subsistence [fishing] gear shall be consistent with any harvest guidelines identified herein."

However, nothing in the Management Agreement requires the Nez Perce to subject their treaty-reserved fishing rights to a gillnet restriction such as that contained in OAR 635-041-0025(3), nor does the agreement otherwise proscribe the use of the type of fishing gear for which defendants were cited under OAR 635-041-0025(3). Likewise, nothing in the record indicates that the Nez Perce Tribe harvests in mainstem treaty fisheries with subsistence fishing gear have failed to be consistent with the harvest

guidelines identified in the Management Agreement; to the contrary, the ODFW fisheries manager explained that he was not aware of any instance in which the Nez Perce Tribe had exceeded its harvest allotments under the Management Agreement.

In short, nothing in the record indicates that the gillnet restriction in OAR 635-041-0025(3) is required under the Management Agreement or is otherwise necessary for achieving the state's conservation goals for Columbia River fish populations. Thus, to the extent that the state argues that OAR 635-041-0025(3) is a permissible restriction of defendants' treaty-reserved fishing rights because it is consistent with the Management Agreement, that argument is—on this record—unpersuasive.

## III.   CONCLUSION

For the reasons explained above, we conclude that the evidence in the record is legally insufficient to support the trial court's conclusion that the gillnet regulation in OAR 635-041-0025(3), and its application to treaty fishers, is necessary for the conservation of Columbia River salmon populations. The trial court therefore erred in denying defendants' motion to dismiss.

Reversed.